**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| PACIFIC SUNWEAR OF CALIFORNIA, INC., a California corporation, *et al.*,[1] | Case No.:  16-10882 (     ) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF GARY H. SCHOENFELD IN SUPPORT OF**
**FIRST DAY MOTIONS**

I, Gary H. Schoenfeld, declare as follows:

1.      I am the President and Chief Executive Officer of Pacific Sunwear of California,
Inc. ("Parent").  Parent and its wholly-owned subsidiaries, Miraloma Borrower Corporation
("Miraloma"), and Pacific Sunwear Stores Corp. ("PS Stores"), are the debtors and debtors in
possession (the "Company") in the above-captioned jointly administered chapter 11 cases (the
"Cases").  I am familiar with the day-to-day operations and business and financial affairs of the
Company, having served in my current capacity since June 29, 2009.  All facts set forth in this
Declaration are based on my personal knowledge, my discussions with other members of the
Company's senior management, my review of relevant documents, or my opinion, based on my
experience and knowledge of the Company's operations and financial conditions.

2.      Prior to joining the Company, I was President of Aritzia Inc., a Canadian fashion
retailer, Chief Executive Officer of Aritzia USA from August 2008 to February 2009, and a
director of Aritzia Inc. from May 2006 to June 2009.  From 2006 until 2008 I was Vice

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as
follows: Pacific Sunwear of California, Inc. (9463-CA); Miraloma Borrower Corporation (0381-Del.); and Pacific
Sunwear Stores Corp. (5792-CA).  The Debtors' address is 3450 East Miraloma Avenue, Anaheim, CA 92806.

Chairman and President and then Co-CEO of Global Brands Group, a brand management and

licensing company based in London and Singapore which is the worldwide master licensee for

The FIFA World Cup (TM).  From September 1995 to July 2004, I was an executive officer of

Vans, Inc., a publicly traded designer, distributor and retailer of footwear.  I joined Vans as Chief

Operating Officer, then became President and a member of the Board of Directors in 1996 and

Chief Executive Officer in 1997.  I am also a former director of several companies, including 24

Hour Fitness, Inc., Hawaiian Airlines, and CamelBak Products, Inc.  I received a Bachelor of

Arts degree from UCLA and a Master of Business Administration degree from Stanford

Business School.

**A.      Overview of the Company**

3.      The Company is a leading specialty retail destination for men's and women's

apparel, accessories, and footwear inspired by the unique and diverse influences of the California

lifestyle.  Rooted in the action sports, fashion, and music heritage of California, the Company

operates a retail and e-commerce business selling a combination of branded and proprietary

casual merchandise designed to appeal to teens and young adults.  Through its retail store

business, the Company operates approximately 593 retail locations nationwide under the names

"Pacific Sunwear" and "PacSun," which stores are principally in mall locations.  Through its e-

commerce business, the Company operates an e-commerce site at www.pacsun.com.

4.      Founded in 1982 in Newport Beach, California as a surf shop, the Company

operates in the teen and young adult retail sector, selling men's and women's apparel,

accessories, and footwear.  The Company sells merchandise through its stores, online at

pacsun.com, and through its mobile application.  The Company features two categories of

merchandise: (i) proprietary merchandise, including brands such as Bullhead Denim, On the

Byas, and LA Hearts; and (ii) branded merchandise, including brands such as Brandy Melville,
Kendall & Kylie, and Nike SB, RVCA, Hurley, and Vans.

5.      The Company provides its customers with a product assortment and shopping
experience that highlight a mix of proprietary and branded merchandise related to action sports,
fashion, art, and musical influences of the California lifestyle.  The Company currently competes
on a national level with leading specialty retail chains, department stores, and online retailers that
offer similar brands and styles of merchandise including: Abercrombie & Fitch, Aéropostale,
Amazon.com, American Eagle Outfitters, The Buckle, Forever21, H&M, Hollister, J.C. Penney,
Karma Loop, Kohl's, Macy's, Nastygal, Nordstrom, Old Navy, Swell, Target, Tilly's, Top Shop,
UNIQLO, Urban Outfitters, The Wet Seal, Zappos, Zara, and Zumiez, as well as a variety of
regional and local specialty shops.  The Company believes the principal competitive factors in
the industry are fashion, merchandise assortment, quality, price, store location, environment, and
customer service.

**B.      Events Leading to these Cases**

        **a.      Initial Success and Growth**

6.      The Company grew quickly after opening in 1982, but its presence exploded
throughout the 1990's.  The Company's relationships with the preeminent action sports brands of
the time (Quiksilver, Billabong, Fox Racing and Volcom) placed the Company at the epicenter
of the rapid growth in popularity of action sports fueled by the X-Games (which began in 1995)
and the Winter X-Games (which began in 1997).  Demand for action sports and the Company's
key brand partners made the Company a leading retailer featuring emerging brands, enabling the
Company to go public in 1993, enjoy excellent share performance and grow its store fleet to a
peak of 965 stores in 2006.  The success of this brand positioning was, however, gradually

eroded, due to industry-wide factors and a series of ill-conceived strategic and operating decisions.

b.    **Industry-Wide Factors Caused a More Competitive and Challenging Market for the Company**

7.    Several industry-wide factors have created a more competitive and challenging market for retailers such as the Company.  First, the continuing fundamental shift in consumer behavior away from traditional mall shopping toward online-only stores has negatively impacted sales in the Company's retail stores.  The Company operates a primarily mall-based chain of retail stores, which is dependent upon the continued popularity of malls as shopping destinations and on the ability of shopping mall anchor tenants and other mall-based attractions to generate consumer traffic.  Second, increased competition throughout the specialty retail fashion industry, and particularly the emergence of fast fashion as a new competitive threat, has hurt the Company, especially because many of the Company's competitors are larger and have significantly greater resources available to them.  Third, increased online shopping and unfavorable or uncertain economic conditions, particularly in certain regions, have adversely affected traditional retailers, as internet retailers do not face the same occupancy costs or store payroll expenses as traditional brick-and-mortar retailers.  Fourth, the entrance and rapid growth of numerous international brands and retailers have adversely affected the Company.  Fifth, the Company's core customer base—teens and young adults—has shifted a larger portion of its discretionary spending to dining, technology, and other consumer products, and away from retail apparel.  Sixth, the action sports segment of the retail industry, around which the Company's early success centered, is no longer as relevant as it had previously been.

8.    As a result of these and other challenges in the broader consumer retail space, the teen and young adult retail sector has been in distress for several years.  Indeed, prior to the

Company's bankruptcy filing, several retailers in this sector, including American Apparel, Inc.,

Quiksilver, Inc., Caché Inc., The Wet Seal, Inc., Deb Stores, dELiA*s, Inc., and Body Central

Corp., filed for bankruptcy protection or were otherwise liquidating.

### c.    Prior Management's Strategic and Operating Mistakes Exacerbated the Company's Financial Downturn

9.    In addition to industry-wide weaknesses, the Company's financial performance

was further adversely impacted by several critical mistakes committed by prior management in

their merchandising and operating strategies.  First, the Company committed a critical error in

2008 by discontinuing the sales of sneakers, which cost the Company a valuable component of

its product mix and created opportunities for the Company's competitors to accelerate their

growth in the footwear segment.  Second, the Company's desire to demonstrate continued

growth caused the Company to invest in two non-core concepts that were eventually

discontinued: (i) D.e.m.o, a late-1990's concept designed to address the growing popularity of

urban influences, peaked with 225 stores in 2006 but was discontinued by 2008 due to

underperformance and waning popularity; and (ii) One Thousand Steps, created in 2006 as a

specialty, fashion forward retailer of branded footwear and accessories, was unsuccessful and

was also discontinued in 2008.  Third, the Company shifted its merchandising strategy toward

proprietary brands in an attempt to compete with vertical retailers, thereby undermining the

Company's core message to consumers and distancing the Company from key brand partners

that had previously fueled the Company's growth.  Fourth, the Company began pushing overly-

discounted "value" merchandise to all underperforming retail locations, resulting in a lack of

consistency in merchandise across stores and further confusion for consumers.  Fifth, the

Company's expansion to nearly 1,000 stores created too large a store footprint with numerous

underperforming stores and above-market occupancy costs.  Sixth, key senior leadership that had

overseen much of the Company's growth left in the mid-2000's, beginning a string of leadership changes that prevented the Company from sending a coherent and consistent message to consumers.  Seventh, the Company's target customer was misaligned; the Company principally appealed to men aged 16-20, but women aged 12-16, which misalignment created a barrier to the Company's ability to attract and retain loyal customers.  Eighth, the Company had no cohesive e-commerce strategy.

10.     These errors confused customers regarding the Company's message and merchandise, damaged critical relationships with key brands, and created opportunities for the Company's competitors to accelerate their growth at the Company's expense.  As a result, the Company was in a weakened competitive position when the 2008-2009 recession occurred, leading to significant financial underperformance, including negative 20% comparable same store sales performance in 2009.

> **d.      The Company's New Management Team Planned and Implemented Strategic and Operational Changes to Turn Around the Company**

11.     In the second quarter of 2009, the Company hired me as its new CEO, its third CEO in four years.  The early portion of my tenure was largely focused on the Company's survival and assembling a capable management team.  I realigned and downsized the Company's management structure.  Fifteen of the top sixteen leadership positions were replaced, and several roles were consolidated.  My vision for the Company was, and remains, to regain the Company's position as a leading destination for the most coveted brands in the California lifestyle market.

12.     Specifically, under my leadership and the new management team, the Company has accomplished the following:

(i) Repaired and cultivated relationships with key brands, thereby reinvigorating the Company's supply pipeline for premier name-brand merchandise and expanding the Company's brand portfolio.

(ii) Supplemented name-brands with stylish lower-cost proprietary offerings, as opposed to the pre-2009 strategy of leading with proprietary offerings and neglecting key name-brand partners.

(iii) Rationalized its store fleet by undertaking a major initiative in 2011 to close underperforming stores, leaving the Company with a lighter store footprint with very few remaining negative contributors.

(iv) Reintroduced sales of sneakers, rectifying a key strategic mistake from prior management.

(v) Improved and expanded its e-commerce and social media platforms, along with other high-impact promotional and marketing efforts, including the successful myGSOM loyalty program launched in 2015.

(vi) Refreshed its overall brand by expanding beyond the core action sports space.

(vii) Developed closer relationships with key vendors, which have resulted in decreasing product lead times to 4-12 weeks today (instead of the 42-week average under prior management), allowing the Company to be far more nimble in responding to the latest trends.

(viii) Improved gender alignment by aging up the target customer, particularly in women's products, to 16-24 years old, which has resulted in each of men's and women's sales generating approximately 50% of the Company's revenue.

(ix) Obtained a $60 million investment from the Term Loan Lenders (as defined below) in the form of a 5-year term loan and a $100 million revolving loan from Wells Fargo Bank.

      e.      **Despite New Management's Success, the Company Faced a Maturing Capital Structure and Burdensome Store Occupancy Costs, Causing the Company to Consider Strategic Alternatives**

13.      Implementation of my strategic vision has successfully stabilized the Company's business, resulting in a strong customer base, an attractive assortment of merchandise, and positive same store sales in 13 of the last 16 quarters through the end of fiscal year 2015, outperforming the vast majority of the Company's peers.  Nevertheless, despite successfully reducing the store fleet and making consistent progress to improve operations, the Company's maturing capital structure and high store occupancy costs have proved untenable.  These factors have required that these Cases be commenced in order to complete the turnaround strategy.

14.      Recognizing these challenges, the Company retained Guggenheim Securities, LLC ("Guggenheim") to serve as the Company's investment banker to explore in-court and out-of court strategic alternatives.  Guggenheim and the Company eventually determined that it would not be possible to effect a transaction without a mechanism to allow the Company to significantly reduce store occupancy costs and restructure their balance sheet.  To that end, beginning in January 2016, the Company engaged with its prepetition Term Loan Lenders (as defined below) in good faith, arm's-length negotiations around the terms of a potential restructuring transaction.  As it became apparent that an out-of-court restructuring would not be possible, the Company, Guggenheim, and FTI Consulting ("FTI"), which was retained in February 2016 to serve as the Company's financial advisors, focused on obtaining debtor-in-possession financing and developing a viable exit strategy to enhance value by enabling the Company to continue as a going concern and emerge from bankruptcy with substantially lower store occupancy costs and significantly less debt.

C.     **The Company's Goals in These Cases**

15.     After months of diligent negotiations, the Company filed bankruptcy petitions. The Company intends to utilize the bankruptcy process to restructure its maturing capital structure and substantially reduce store occupancy costs, thereby allowing the reorganized Company to continue to execute the operational and strategic turnaround that my management team and I have implemented.  The Company believes that doing so will help restore the Company to a stronger and more sustainable financial position and maximize value.

16.     To meet its objectives, the Company and Wells Fargo Bank, National Association agreed on that certain Debtor-in-Possession Credit Agreement, dated as of April 7, 2016 (the "Debtor-in-Possession Credit Agreement"), which provides for a senior secured, super-priority credit facility (the "DIP Facility") of up to $100 million, which should provide the Company with sufficient runway to navigate through the reorganization process.

17.     In addition, the Company filed these Cases with a fully-negotiated Restructuring Support Agreement (the "RSA") and plan of reorganization (the "Plan"), pursuant to which PS Holdings of Delaware, LLC - Series A and PS Holdings of Delaware, LLC - Series B, in their capacity as lenders (the "Term Loan Lenders") under that certain Credit Agreement dated as of December 7, 2011 (the "Term Loan Credit Agreement"), will convert a portion of their debt into 100% of the equity interests of the Reorganized Parent, with the remaining debt being converted into a new term loan, and will invest a minimum of an additional $20 million in the Company upon its emergence from chapter 11 in either debt or equity, or a combination of debt and equity. The RSA establishes various milestones, pursuant to which the Company anticipates confirming the Plan within 120 days of the filing date.  Pursuant to the RSA and the Plan, Guggenheim will seek a higher and better competing transaction through a marketing process commencing on or about the filing date and governed by bidding procedures, for which the Company is seeking

court approval.  Following the sale process, and in accordance with such bidding procedures, an auction would be conducted if a higher and better bid is submitted.  If a higher and better bid, which provides for, among other things, payment in full of the Term Loan Lenders' claims, is not received, the auction will be cancelled and the Term Loan Lenders will be the winning bidder.  The RSA is attached hereto as <u>Exhibit A</u>.

18.    In sum, based on my experience, I believe that the Plan (or a competing transaction consummated pursuant to a higher and better bid) presents the best option for the Company to maximize its value under the circumstances, as it provides a blueprint for how the Company will navigate through the reorganization process and should provide needed confidence to the Company's vendors, suppliers, customers and employees and thereby prevent the reduction of value that would likely occur with no exit strategy in place.  Moreover, the Plan (or a competing transaction consummated pursuant to a higher and better bid) provides the Company with the time it needs to complete the operational and strategic turnaround that my management team and I began several years ago, and to emerge from bankruptcy in a stronger and more sustainable financial position.

**D.    Company's Investigation of Claims**

19.    In addition to a complete perfection analysis[2] of the Term Loan Lenders and ABL Lender's liens, in anticipation of entry into the RSA , the Company—at the direction of its

---

[2] The Company investigated the perfection of the ABL Lender and Term Loan Lenders' liens.  Based on that investigation, I am advised that the Company has concluded that the ABL Lender and Term Loan Lenders have perfected security interests and liens in substantially all of the property and assets of Parent and PS Stores other than (1) "Property" as such term is defined in the mortgage for the Debtors' facility located at 21800 W. 167th Street, Olathe, Kansas, (2) the equity interests held by Parent in PS Stores, (3) any leases, (4) commercial tort claims or (5) any cash that is not in a deposit account subject to the control of the ABL Lender or the Term Loan Lenders, unless such cash is identifiable proceeds from collateral.  I am further advised that

disinterested directors of the board—through its outside litigation counsel, Connolly & Finkel LLP, led by senior partner John Connolly, conducted an in-depth and detailed investigation (the "Investigation") into potential claims and causes of action against the Term Loan Agent, the Term Loan Lenders and their affiliates, including directors affiliated therewith (the "Term Loan Parties"), including but not limited to whether the Term Loan Parties breached any duties or covenants that they may have owed to the Company.  I am advised that this thorough Investigation revealed that the Company has no viable claims or causes of action against the Term Loan Parties.[3]

20.     In the course of conducting the Investigation, the Company interviewed each of the members of Parent's board of directors, and several of the Debtors' officers, including myself, Craig E. Gosselin, Senior Vice President, Secretary, General Counsel and Human Resources, Chris Tedford, Vice President and Interim CFO, and Ernie Sibal, Vice President, Real Estate, Construction and Strategy.  In addition, the Company reviewed the underlying transactional documents, including the Credit Agreement with the Term Loan Lenders, and all of the exhibits thereto, as well as the minutes of the meetings of the Company's board of directors from 2010 to the present, including all presentations and exhibits thereto.  Mr. Connolly worked directly with the Company's general counsel, Craig Gosselin, and his team in identifying all relevant documents to be reviewed.

21.     After the conclusion of the Investigation, Mr. Connolly discussed his findings with the officers of the Company and the members of Parent's board of directors and the

---

the ABL Lender and Term Loan Lenders do not purport to hold liens against any assets of Miraloma.

[3] The Company also investigated any potential claims and causes of action against the ABL Agent, the ABL Lender, and their affiliates, and I am advised that the Company has no viable claims or causes of action against such parties.

Company.  I am advised that he determined that there was no evidence of any viable claims that the Company may hold against the Term Loan Parties or any defenses the Company may have to the Term Loan Parties' claims, and the Company determined that entry into the RSA and stipulation to the validity, priority and amount of the Term Loan Parties' claims was appropriate. He further determined that the two directors appointed by the Term Loan Parties on the board were not involved in any deliberation or decision-making associated with the Investigation, entry into the RSA, or stipulation regarding the Term Loan Parties' claims.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 7th day of April, 2016 at Anaheim, California.

Pacific Sunwear of California, Inc., *et al.*, Debtors and Debtors in Possession

By: Gary H. Schoenfeld
Its:  Chief Executive Officer

**<u>Exhibit A</u>**

**<u>RSA</u>**

EXECUTION VERSION

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time, this "***Agreement***") is made and entered into as of April 6, 2016, by and among: (i) Pacific Sunwear of California, Inc., Pacific Sunwear Stores Corp., and Miraloma Borrower Corporation, as soon to be debtors and debtors in possession (collectively, the "***Debtors***") in chapter 11 cases (collectively, the "***Chapter 11 Cases***") to be commenced in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"); (ii) PS Holdings of Delaware, LLC - Series A and PS Holdings of Delaware, LLC - Series B, in their capacities as lenders (each, a "***Consenting Term Loan Lender***") under that certain Credit Agreement dated as of December 7, 2011 (as further amended, modified, waived, or supplemented through the date hereof, the "***Term Loan Agreement***"); and (iii) PS Holdings Agency Corp. in its capacity as administrative agent and collateral agent (in such capacities, together with its permitted successors and assigns, the "***Consenting Term Loan Agent***," together with the Consenting Term Loan Lenders, the "***Consenting Term Loan Parties***") under the Term Loan Agreement. The Debtors and the Consenting Term Loan Parties, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, are referred herein as the "***Parties***" and individually as a "***Party***."

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (as defined below), which Plan and all annexes thereto are expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein.

**THE PROPOSED TERMS AND CONDITIONS SET FORTH IN THIS RESTRUCTURING SUPPORT AGREEMENT ARE THE PRODUCT OF NEGOTIATIONS AMONG THE PARTIES, TOGETHER WITH THEIR RESPECTIVE REPRESENTATIVES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW AND THE PROVISIONS OF THE BANKRUPTCY CODE.**

## RECITALS

**WHEREAS**, the Debtors intend to implement a restructuring of their balance sheet pursuant to the plan of reorganization attached hereto as **Exhibit A** (as may be amended or modified in accordance with Section 7 hereof, the "***Plan***");

**WHEREAS**, the Debtors intend to implement the Plan;

**WHEREAS**, upon commencement of the Chapter 11 Cases, the Debtors will concurrently file the Plan and simultaneously therewith commence a process to solicit competing transactions (any such transaction, a "***Competing Transaction***") through the approval of the agreed upon bidding procedures (attached hereto as **Exhibit B**, the "***Bidding Procedures***"), which Competing Transaction, to qualify for consideration under the Bidding

Procedures, must satisfy the DIP Facility Claims, the ABL Claims, and the Claims held by the Consenting Term Loan Parties in full in cash from the proceeds paid as part of any such Competing Transaction on the date of consummation;

**WHEREAS**, pursuant to the Plan and the Bidding Procedures, the Consenting Term Loan Lenders have agreed to sponsor a plan of reorganization pursuant to which a portion of their Claims will be converted into 100% of the equity in the Reorganized Debtors;

**WHEREAS**, to the extent the Debtors receive a Qualified Bid (as defined in the Bidding Procedures), the Debtors will conduct an Auction (as defined in the Bidding Procedures) and otherwise proceed with the Competing Transaction in accordance with the Bidding Procedures;

**WHEREAS**, in accordance with the Bidding Procedures, to the extent the Debtors do not receive any Qualified Bids, the Auction will be cancelled and the Debtors will move directly to confirmation of the Plan;

**WHEREAS**, this Agreement, the Plan, and the Bidding Procedures are the product of arm's-length, good faith discussions among the Parties; and

**WHEREAS**, the Parties are prepared to perform their obligations hereunder, subject to the terms and conditions hereof.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

<u>**AGREEMENT**</u>

**Section 1.**    *Agreement Effective Date.*

This Agreement shall be effective and binding with respect to each of the Parties at the time at which (i) the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Term Loan Parties and (ii) the Consenting Term Loan Parties shall have executed and delivered to the Debtors counterpart signature pages of this Agreement (the "***Agreement Effective Date***").   After the Agreement Effective Date, the terms and conditions of the Plan and/or this Agreement may only be amended, modified, waived, or otherwise supplemented as set forth in Section 7 herein.

**Section 2.**    **Agreement Controls.**

The Plan is expressly incorporated herein and is made part of this Agreement.   The Plan is supplemented by the terms and conditions of this Agreement.   In the event of any inconsistency between the terms of this Agreement and the Plan, this Agreement shall control and govern; *provided* that following confirmation of the Plan, solely the terms of the Plan shall control and govern.

**Section 3.**        **Commitments Regarding the Plan.**

3.01.    <u>Commitments of the the Consenting Term Loan Parties</u>.  Subject in all respects to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof:

(a)        each of the Consenting Term Loan Parties hereby covenants and agrees, prior to the occurrence of a 363 Triggering Event (notice of which has not been rescinded), to support the Plan (including, but not limited to, the approval of the Bidding Procedures, any Competing Transaction (so long as it is qualified per the terms of the Bidding Procedures), and the solicitation, confirmation, and consummation of the Plan, as may be applicable), and to execute and deliver any other documents or agreements reasonably required to effectuate and consummate the Plan, including the Definitive Documents (as defined herein);

(b)        each of the the Consenting Term Loan Parties hereby covenants and agrees, prior to the occurrence of a 363 Triggering Event (notice of which has not been rescinded), that it shall not directly or indirectly, or encourage any other entity to directly or indirectly, (i) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, implementation, consummation, or amendment (whether before or after confirmation, *provided* that such amendment is consistent with this Agreement) of the Plan; (ii) propose, file, support, vote for, or take any other action in furtherance of any restructuring, disposition of assets, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Plan; (iii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtors or any direct or indirect subsidiaries of the Debtors that are not Debtors other than as expressly permitted by the Plan; or (iv) seek, solicit, support, encourage, vote, or cause to be voted its Claims in support of, consent to, or encourage any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Debtors other than the Plan;

(c)        each of the Consenting Term Loan Parties hereby covenants and agrees, prior to the occurrence of a 363 Triggering Event (notice of which has not been rescinded), to (i) disclose to the Company on the Agreement Effective Date all Claims on account of principal and interest obligations outstanding as of the date of this Agreement that it holds, controls, or has the ability to control, against the Debtors; (ii) subject to the receipt by the Consenting Term Loan Parties of a Disclosure Statement consistent with this Agreement, timely vote or cause to be voted all Claims against the Debtors that it holds, controls, or has the ability to control, to accept the Plan by delivering its duly executed and completed ballot accepting the Plan upon Bankruptcy Court approval of the Disclosure Statement and solicitation of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code; (iii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); *provided, however*, that, subject to all remedies available to the Debtors at law, equity or otherwise, such vote may, upon written notice to the Debtors, the Consenting Term Loan Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any of the Consenting Term Loan Parties at any time following a Consenting Term Loan Parties Termination Event (as defined herein) or 363 Triggering Event; (iv) take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement and the Plan, and to refrain from taking any action that would in

any material respect interfere with, delay, or postpone the effectuation of the restructuring transactions contemplated by this Agreement and the Plan; (v) support and consummate the transactions contemplated under this Agreement and the Plan; and (vi) furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the other Parties if the Consenting Term Loan Parties know of a breach by any of the Consenting Term Loan Parties in any respect of any of the obligations, representations, warranties, or covenants of the Consenting Term Loan Parties set forth in this Agreement; and

(d)    each of the Consenting Term Loan Parties hereby covenants and agrees that, after the occurrence of a 363 Triggering Event (notice of which has not been rescinded), if any, to take all actions reasonably necessary to credit bid some or all of their Term Loan Claims, which credit bid would be consummated outside of a chapter 11 plan pursuant to sale under section 363 of the Bankruptcy Code (a "**363 Sale**") and shall not, directly or indirectly: (i) engage in any legal proceeding to object to, or interfere with the implementation of the Restructuring pursuant to the 363 Sale; (ii) pursue or initiate or have initiated on its behalf, any litigation or proceeding of any kind to foreclose on any collateral; or (iii) encourage any entity to undertake any action set forth in the foregoing clauses (i) and (ii).

3.02.    <u>Rights of Consenting Term Loan Parties Unaffected</u>.  This Agreement, including the foregoing provisions of Section 3.01 will not (A) limit the rights of the Consenting Term Loan Parties to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and/or the terms of the Plan, and, other than as a result of actions or omissions any such Consenting Term Loan Party takes or does not take in good faith to enforce its rights under this Agreement and/or the terms of the Plan, do not hinder, delay, or prevent consummation of the Plan; and (B) prohibit the Consenting Term Loan Parties from appearing in proceedings for the purpose of contesting whether any matter or fact is or results in a breach of, or is inconsistent with, this Agreement (so long as such appearance is not solely for the purpose of hindering or intending to hinder, the Plan) or for the purpose of taking such action as may be necessary in the discretion of such Consenting Term Loan Party to protect such Consenting Term Loan Party's interests upon such breach; *provided*, *further* that the Parties hereby reserve their rights to oppose such relief; *provided*, *further* that except as expressly provided herein, this Agreement and all communications and negotiations among the Consenting Term Loan Parties with respect hereto or any of the transactions contemplated hereunder are without waiver or prejudice to the Consenting Term Loan Parties' rights and remedies and the Consenting Term Loan Parties hereby reserve all claims, defenses, and positions that they may have with respect to each other and/or the Debtors in the event the Plan is not consummated or this Agreement terminates.

3.03.    <u>Obligations of the Debtors</u>.

(a)    <u>Affirmative Covenants</u>.  Subject in all respects to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof, each of the Debtors covenants and agrees to:

(i)    commence the Chapter 11 Cases on or before April 14, 2016 (the "**Petition Date**");

(ii)    file with the Bankruptcy Court on the Petition Date the Plan and the Disclosure Statement and motion to approve the Disclosure Statement, which Plan shall be in the form attached hereto and which Disclosure Statement shall be acceptable in form and substance to each of the Consenting Term Loan Parties;

(iii)    (A) support and take all actions reasonably necessary or requested by the Consenting Term Loan Parties to facilitate the solicitation, confirmation, and consummation of the Plan or, from and after the occurrence of a 363 Triggering Event (as defined below), the 363 Sale (as defined below); (B) not take any action or commence or continue any proceeding that is inconsistent with, or that would delay or impede the solicitation, confirmation, or consummation of the Plan or the 363 Sale, as applicable; and (C) support the payment, release, exculpation, and injunction provisions set forth in the Plan or the 363 Sale, as applicable;

(iv)    file with the Bankruptcy Court on the Petition Date a motion seeking approval of the Bidding Procedures (the "***Bidding Procedures Motion***"), which Bidding Procedures Motion shall be consistent with the terms of this Agreement, acceptable in form and substance to each of the Consenting Term Loan Parties, and distributed to the respective legal and financial advisors for the Consenting Term Loan Parties at least five (5) days in advance of filing so as to afford the opportunity to comment and review in advance of any filing thereof

(v)    file with the Bankruptcy Court on the Petition Date a motion seeking approval of and authority to enter into the DIP Facility (the "***DIP Motion***"), which DIP Motion shall be consistent with the terms of this Agreement, acceptable in form and substance to each of the Consenting Term Loan Parties, and distributed to the respective legal and financial advisors for the Consenting Term Loan Parties at least five (5) days in advance of filing so as to afford the opportunity to comment and review in advance of any filing thereof;

(vi)    obtain a Bankruptcy Court order approving the DIP Motion on an interim basis that is consistent with the terms of this Agreement and acceptable in form and substance to each of the Consenting Term Loan Parties (the "***Interim DIP Order***") within three (3) business days of the Petition Date;

(vii)    obtain a Bankruptcy Court order approving the DIP Motion on a final basis that is consistent with the terms of this Agreement and acceptable in form and substance to each of the Consenting Term Loan Parties (the "***Final DIP Order***") within thirty (30) days of the date of entry of the Interim DIP Order;

(viii)    obtain a Bankruptcy Court order approving the Bidding Procedures Motion that is consistent with the terms of this Agreement and acceptable in form and substance to each of the Consenting Term Loan Parties (the "***Bidding Procedures Order***") within thirty-five (35) days of the Petition Date;

(ix)    comply with the the Bidding Procedures Order in all material respects;

(x)    obtain a Bankruptcy Court order approving the Disclosure Statement and authorizing the Debtors to commence solicitation of the Plan, which order shall be consistent with the terms of this Agreement and acceptable in form and substance to each of the Consenting Term Loan Parties in their respective sole discretion (the "***Disclosure Statement Order***") within fifty (50) days of the Petition Date;

(xi)    commence solicitation of votes on the Plan or the Competing Transaction (if such Competing Transaction is in the form of a modified plan), (a) if the Term Loans Lenders are the Winning Bidder, no later than five (5) business days after the later of (I) the selection of the Winning Bidder and (II) entry of the Disclosure Statement Order, and (b) if the Term Loan Lenders are not the Winning Bidder, no later than fourteen (14) days after the selection of the Winning Bidder, *provided*, for the avoidance of doubt, that if there are no Qualified Bids, the Consenting Term Loan Lenders shall be deemed the Winning Bidder;

(xii)    if a Competing Transaction is the Winning Bidder and is in the form of a 363 Sale, obtain a Bankruptcy Court order approving such sale within five (5) business days after the auction and close such sale within fifteen (15) calendar days after the entry of such order;

(xiii)    obtain a Bankruptcy Court order confirming the Plan, including the settlements provided therein, which order shall be consistent with the terms of this Agreement and acceptable in form and substance to each of the Consenting Term Loan Parties in their respective sole discretion (the "***Confirmation Order***"), within one hundred and twenty (120) days of the Petition Date;

(xiv)    consummate the Plan within one hundred forty (140) days after the Petition Date;

(xv)    provide draft copies of all material motions, applications, orders, agreements, and other documents the Debtors intend to file with the Bankruptcy Court to counsel to the Consenting Term Loan Parties no later than two (2) business days prior to the date the Debtors intend to file any such motion, application, order, agreement, or other document (except where not reasonably practicable) and consult in advance in good faith with the counsel to the Consenting Term Loan Parties regarding the form and substance of any such proposed filing; *provided*, *however*, that the obligations under this paragraph (xv) shall in no way alter or diminish any right expressly provided to any Consenting Term Loan Party under this Agreement to review, comment on, and/or consent to the form and/or substance of any document;

(xvi)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee; (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (C) dismissing the Chapter 11 Cases; (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; or (E) objecting to the Consenting Term Loan Parties' Claims;

(xvii)    provide    the    Consenting    Term    Loan    Parties'    advisors (A) reasonable access during normal business hours to the Debtors' books, records and facilities, (B) reasonable access to the Debtors' respective management and advisors (to the fullest extent possible under applicable law), (C) timely responses to all reasonable requests for information, recognizing that the Debtors' priority is to manage and preserve the Debtors' business, *provided* that nothing herein shall be deemed or construed to create any due diligence condition with respect to this Agreement and the Plan or to constitute or require a waiver of any privilege, and (D) reasonable information with respect to all of the Debtors' executory contracts and unexpired leases for the purposes of (1) consulting with the Debtors and their advisors regarding which executory contracts and unexpired leases the Debtors intend to assume, assume and assign, or reject in the Chapter 11 Cases and (2) concluding, in consultation with the Debtors and their advisors, which executory contracts and unexpired leases are to be assumed, assumed and assigned, or rejected pursuant to the Plan;

(xviii)    to the extent not otherwise paid (including pursuant to the Interim DIP Order or the Final DIP Order), indefeasibly pay in full in cash all out of pocket, reasonable and documented fees and expenses (including attorney and advisor fees and expense) of the Consenting Term Loan Parties;

(xix)    comply in all material respects with the covenants contained in the DIP Facility; and

(xx)    furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the Consenting Term Loan Parties if the Debtors know or should know of a breach by any Debtor in any respect of any of the obligations, representations, warranties, or covenants of the Debtors set forth in this Agreement.

(b)    <u>Negative Covenants</u>.  Subject to the terms and conditions hereof, and for so long as this Agreement has not been terminated in accordance with the terms hereof, each of the Debtors shall not, and shall not directly or indirectly permit any entity to:

(i)    modify the Plan, in whole or in part, in a manner that is inconsistent with the terms of this Agreement;

(ii)     take any action that is inconsistent with this Agreement, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of the Plan or the 363 Sale, as applicable;

(iii)    withdraw or revoke the Plan or the 363 Sale, as applicable or publicly announce its intention not to pursue the Plan or the 363 Sale, as applicable;

(iv)    take any action challenging the amount and/or validity of the Claims of any Consenting Term Loan Party (including any Claims for interest, premiums, fees, and expenses); the validity, enforceability, and/or perfection of the liens held by any Consenting Term Loan Party; or the rights of the Consenting Term Loan Parties to credit bid some or all of their Claims arising under the Term Loan Agreement;

(v)     file any motion, pleading, or other Definitive Document with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent in any material respect with this Agreement (including with respect to any consent right provided under this Agreement);

(vi)    move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract or unexpired lease without the consent of the Consenting Term Loan Parties;

(vii)   amend or propose to amend its respective certificate or articles of incorporation, bylaws, or comparable organizational documents;

(viii)  without the written consent of the Consenting Term Loan Parties, acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets, or otherwise) (A) any corporation, partnership, limited liability company, joint venture, or other business organization or division or (B) assets of the Debtors, other than in the ordinary course of business consistent with past practices;

(ix)    incur any capital expenditures in excess of the amounts permitted under the DIP Facility;

(x)     incur or suffer to exist any indebtedness, except indebtedness existing and outstanding immediately prior to the date hereof, payables for goods and services, and liabilities arising and incurred in the ordinary course of business, and indebtedness arising under the DIP Facility; or

(xi)    incur any liens or security interests, except as permitted under the DIP Facility.

Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prevent any Debtor from taking or failing to take any action that it is obligated to take (or not take, as the case may be) in the performance of any fiduciary duty or as otherwise required

by applicable law which such Debtor owes to any other person or entity under applicable law (as reasonably determined by such Debtor in good faith upon advice of legal counsel); *provided*, that it is agreed that any such action that results in a Termination Event hereunder shall be subject to the provisions set forth in Sections 6.01 and 6.03 hereto. Each of the Debtors represents to the Consenting Term Loan Parties (without giving consideration or effect to the immediately preceding sentence) that as of the Agreement Effective Date, based on the facts and circumstances actually known by the Debtors as of the Agreement Effective Date, the Debtors' entry into this Agreement is consistent with all of the fiduciary duties of each of the Debtors.

3.04.   Definitive Documents.

Each Party hereby covenants and agrees, severally and not jointly, to the extent applicable, to (a) negotiate in good faith each of the documents and any amendments or modifications thereto (or the forms thereof, as applicable) implementing, achieving, and relating to the Plan, including without limitation, (i) the Disclosure Statement, (ii) the Disclosure Statement Order, (iii) the credit agreement providing for the DIP Facility, (iv) the Interim DIP Order; (v) the Final DIP Order; (vi) the Bidding Procedures Motion, (vii) the Bidding Procedures Order, (viii) the Plan Supplement, and (ix) the proposed order approving and confirming the Plan, including the settlements described therein (the "***Confirmation Order***") (collectively, the "***Definitive Documents***"), which Definitive Documents shall contain terms and conditions consistent in all respects with this Agreement; and (b) execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents.

3.05.   Investment Manager Limitation.

The obligations of any Consenting Term Loan Lender are limited to, in the case of investment advisors, the Claims controlled by such investment manager in the funds or accounts it manages.

**Section 4.    Triggering Events/Termination**

4.01.   363 Events.  The occurrence of any of the following events (a "***363 Event***"):

(a)    The Debtors fail to obtain entry of the Bidding Procedures Order within thirty-five (35) days of the Petition Date;

(b)    The Debtors fail to obtain entry of the Disclosure Statement within fifty (50) days of the Petition Date;

(c)    The filing of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or

(d)    The Debtors' exclusive right to file a plan under section 1121 of the Bankruptcy Code is terminated pursuant to a Final Order or expires.

4.02.   <u>Company's Obligations after a 363 Triggering Event</u>.  After the occurrence of a 363 Event, the Consenting Term Loan Parties may, in their sole discretion, deliver notice to the Debtors of such occurrence.  The Debtors' receipt of such a notice is a "***363 Triggering Event***." Upon the occurrence of a 363 Triggering Event, the Debtors agree that, unless the Consenting Term Loan Parties rescind the notice provided in connection therewith, they shall negotiate in good faith a 363 Sale with the Consenting Term Loan Parties and shall seek to take all actions reasonably necessary to facilitate a 363 Sale, pursuant to which the Consenting Term Loan Parties would credit bid some or all of their Claims arising under the Term Loan Agreement for substantially all of the Debtors' assets.  If, at the time of the 363 Triggering Event, the Bankruptcy Court has already approved bidding procedures consistent with the foregoing, the Debtors shall conduct an auction to determine if there are higher and better bids than the Consenting Term Loan Lenders' 363 Sale and shall seek approval of the results of such auction as soon as permitted under any order approving such procedures.

4.03.   <u>Implementation of 363 Sale Upon Occurrence of a 363 Triggering Event</u>.  Upon the occurrence of a 363 Triggering Event (unless and until any notice giving rise to such 363 Triggering Event is rescinded by the Consenting Term Loan Parties), the Consenting Term Loan Parties shall no longer have any obligation to the Debtors to support the Plan; *provided*, *however*, that the Consenting Term Loan Parties shall remain obligated to support a 363 Sale pursuant to Section 3.01(d) of this Agreement.

**Section 5.      Representations and Warranties.**

5.01.   <u>Mutual Representations and Warranties</u>.  Subject to Section 3.05 hereof, each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party (to the extent applicable), as of the Agreement Effective Date, as follows (each of which is a continuing representation, warranty, and covenant):

(a)      it is validly existing and in good standing under the laws of the state or other jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws;

(b)      except as expressly provided in this Agreement, it has all requisite direct or indirect power and authority to enter into this Agreement and to carry out the Plan contemplated by, and perform its respective obligations under, this Agreement;

(c)      the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part and no consent, approval, or action of, filing with, or notice to any governmental or regulatory authority is required in connection with the execution, delivery, and performance of this Agreement; and

(d)      it has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel, and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereof.

**Section 6.**          **Termination Events.**

6.01.          <u>Consenting Term Loan Party Termination Events</u>.  Any Consenting Term Loan Party may terminate its obligations and liabilities under this Agreement upon three (3) days prior written notice to the other Parties delivered in accordance with Section 9.12 hereof, upon the occurrence and continuation of any of the following events (each, a "***Consenting Term Loan Party Termination Event***"), *provided* that any termination must be effectuated by written notice provided to the other Parties not later than five (5) business days after the date on which such Consenting Term Loan Party first has actual knowledge of the occurrence of the Consenting Term Loan Party Termination Event:

(a)          the breach by the Debtors of any of their covenants, obligations, representations, or warranties under Section 3.03 or Section 4 that remains uncured for five (5) days after the receipt by the breaching Party of written notice of such breach;

(b)          the Plan is amended or otherwise modified so as to be materially inconsistent with this Agreement or otherwise without the consent of the Consenting Term Loan Parties;

(c)          the termination of or occurrence of an event of default (as defined in the applicable agreement) under the DIP Facility, which shall not have been cured within any applicable grace periods or waived pursuant to the terms of the DIP Facility;

(d)          the Debtors challenge, or any party in the Chapter 11 Cases is granted standing to challenge, the amount and/or validity of the Claims of any Consenting Term Loan Party or the validity, enforceability, and/or perfection of the Liens held by any Consenting Term Loan Party;

(e)          the Debtors' License Agreements (as defined in the Plan) are terminated by either the Debtors or the counterparties thereto or are determined by Final Order of the Bankruptcy Court (or other court of competent jurisdiction) to be incapable of assumption and/or assumption and assignment;

(f)          the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of the Plan in a way that cannot be reasonably remedied by the Debtors or would have a material adverse effect on consummation of the Plan;

(g)          the Bankruptcy Court enters an order (i) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases;

(h)          the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code; and

(i)          exercise by any of the Debtors of its "fiduciary out" as debtors-in-possession as provided for in Section 3.03 of this Agreement.

6.02.   <u>Debtor Termination Events</u>.   The Debtors may terminate their obligations and liabilities under this Agreement upon three (3) days prior written notice to the other Parties delivered in accordance with Section 9.12 hereof, upon the occurrence of any of the following events (each, a "***Debtor Termination Event***" and together with the Consenting Term Loan Party Termination Events, the "***Termination Events***," and each a "***Termination Event***"), *provided* that any termination must be effectuated by written notice provided to the other Parties not later than five (5) business days after the date on which the Debtors first have actual knowledge of the occurrence of the Debtor Termination Event:

(a)   the breach by any of the Consenting Term Loan Parties of any of their covenants, obligations, representations, or warranties under Section 3.03 or Section 4 that remains uncured for five (5) days after the receipt by the breaching Party of written notice of such breach;

(b)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would have a material adverse impact on the consummation of the Plan (taken as a whole); or

(c)   the reasonable determination by the board of directors (or similar body) of any of the Debtors, made in good faith and upon advice of outside counsel, that proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties.

6.03.    Effect of Termination.

(a)    Upon any termination of this Agreement by any Party under Section 6.01 or 6.02, (i) this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and the Plan, including without limitation, any obligation of the terminating Consenting Term Loan Party, to support, consent, vote for, agree to, or not object to any provision in the Plan, to waive, release, or limit any of such Consenting Term Loan Party's Claims against the Debtors or any other entity or person, and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Plan or otherwise, that it would have been entitled to take had it not entered into this Agreement; and (ii) any and all consents and ballots tendered by the Consenting Term Loan Parties prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Debtors allowing such change or resubmission). Notwithstanding any provision in this Agreement to the contrary, any claim for breach of this Agreement that accrued prior to the date of a Party's termination or termination of this Agreement (as the case may be) and all rights and remedies of the Parties hereto shall not be prejudiced as a result of termination.

(b)    Notwithstanding any provision in this Agreement to the contrary, no Party shall terminate this Agreement if such Party (in any capacity in which it is Party to this Agreement) is in breach of any provision hereof.

(c)    Notwithstanding any provision in this Agreement to the contrary, the non-breaching Consenting Term Loan Parties and the Debtors may each agree to continue to be bound by the terms of this Agreement notwithstanding such breach.

(d)    Notwithstanding any provision in this Agreement to the contrary, nothing in this Section 6.03 shall prohibit any non-breaching Party from seeking enforcement of any rights under this Agreement with respect to the period prior to the occurrence of the Termination Date.

6.04.    Termination Upon Consummation of the Plan.  This Agreement shall terminate automatically without any further required action or notice upon the consummation of the Plan.

6.05.    Waiver of Right to Terminate.  If a Party fails to provide notice as required under Section 5.01 or 5.02 within ten (10) business days after such Party becomes aware of the occurrence of an applicable Termination Event, such Party shall be deemed to have waived the right to terminate this Agreement on account of such Termination Event.

## Section 7.    Amendments.

This Agreement, the Plan, the Definitive Documents, or any annexes thereto may not be modified, amended, or supplemented, nor may any terms and conditions hereof or thereof be

waived, without the prior written consent of the Debtors and each of the Consenting Term Loan Parties.

**Section 8.    No Solicitation.**

Notwithstanding anything to the contrary herein, this Agreement is not and shall not be deemed to be (a) a solicitation of consents to the Plan or any chapter 11 plan or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act and the Securities Exchange Act of 1934, as amended.

**Section 9.    Miscellaneous.**

9.01.   <u>Claim Resolution Matters</u>.   Prior to the entry of the Confirmation Order and the effective date of any transactions contemplated thereby or under the Plan, the Company shall not enter into any agreements relating to the allowance, estimation, validity, extent, or priority of prepetition Claims, or the treatment and classification of such prepetition Claims under the Plan, with any holders of prepetition Claims, other than the Consenting Term Loan Parties and the Holders of ABL Claims, without the prior written consent of the Consenting Term Loan Parties, except with respect to claims that the Company is authorized to resolve or pay pursuant to any applicable first day orders, the form of which was approved by the Consenting Term Loan Parties.

9.02.   <u>Assignment, Transfer Restrictions</u>.

(a)    Each Consenting Term Loan Lender hereby agrees, severally and not jointly, for so long as this Agreement shall remain in effect, not to sell, assign, transfer, hypothecate or otherwise dispose of (including by participation) any Claim against or Interest in the Debtor unless, as a condition precedent to any such transaction, the transferee thereof executes and delivers a joinder in the form of Exhibit C hereto ("***Joinder***") to the Parties within three (3) Business Days of the execution of an agreement (or trade confirmation) in respect of the relevant transfer.   Upon execution of the Joinder, the transferee shall be deemed to be a Consenting Term Loan Lender for purposes of this Agreement.

(b)    Any sale, assignment, transfer, hypothecation or other disposition (including by participation) of any Claim or Interest that does not comply with the procedures set forth in Section 9.02(a) of this Agreement shall be deemed void ab initio.

(c)    Any person that receives or acquires a portion of a Claim or Interest of a Consenting Term Loan Party pursuant to a sale, assignment, transfer, hypothecation or other disposition (including by participation) of such Claim or Interest by a Consenting Term Loan Party hereby agrees to be bound by all of the terms of this Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) (a "***Joining Party***") by executing and delivering a Joinder.   The Joining Party shall thereafter be deemed to be a Consenting Term Loan Lender for all purposes under this Agreement.

9.03.   <u>Access</u>.   The Debtors will afford the Consenting Term Loan Parties and their attorneys, consultants, accountants, and other authorized representatives reasonable access to all

properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Debtors.

9.04.    <u>Further Assurances</u>.    Subject to the other terms hereof, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be commercially reasonably appropriate or necessary, from time to time, to effectuate the Plan in accordance with this Agreement.

9.05.    <u>Complete Agreement</u>.    This Agreement, exhibits, and the annexes hereto, including the Plan, represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between the Parties with respect thereto.  No claim of waiver, consent, or acquiescence with respect to any provision of this Agreement, exhibits, and annexes hereto shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

9.06.    <u>Parties</u>.    This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit, or any legal or equitable right, remedy, or claim under this Agreement.

9.07.    <u>Headings</u>.    The headings of all Sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

9.08.    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  Notwithstanding the foregoing consent to New York jurisdiction, after the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

9.09.    <u>Execution of Agreement</u>.    This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

9.10.   <u>Interpretation</u>.  This Agreement is the product of negotiations between the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

9.11.   <u>Successors and Assigns</u>.   This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

9.12.   <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, if sent by hand delivery, electronic mail, courier, or overnight delivery (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)    if to the Debtors, to:

> Pacific Sunwear of California, Inc.
> 3459 E. Miraloma Ave
> Anaheim, California 92806
> Attention:  Craig Gosselin
> E-mail address:  cgosselin@pacificsunwear.com

> with copy (which shall not constitute notice) to:

> Klee, Tuchin, Bogdanoff & Stern LLP
> 1999 Avenue of the Stars, 39th Floor
> Los Angeles, California 90067
> Attention:  Michael L. Tuchin
> E-mail addresses:  mtuchin@ktbslaw.com

    (b)    if to the Consenting Term Loan Parties,  to:

> c/o PS Holdings of Delaware, LLC - Series A
> One Embarcadero Center, 39th Floor
> San Francisco, California 94111
> Attn: Stephen Oetgen, P.C.
> E-mail address:  soetgen@goldengatecap.com

> and

> c/o PS Holdings of Delaware, LLC - Series B
> One Embarcadero Center, 39th Floor
> San Francisco, California 94111
> Attn: Stephen Oetgen, P.C.
> E-mail address:  soetgen@goldengatecap.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Joshua A. Sussberg, P.C.
E-mail address:  jsussberg@kirkland.com

- and -

Kirkland & Ellis LLP
555 California Street
San Francisco, California 94104
Attn:  Melissa N. Koss
E-mail address:  melissa.koss@kirkland.com

Any notice given by hand delivery, electronic mail, mail, or courier shall be effective when received.

9.13.    Waiver.    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of each of the Consenting Term Loan Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its Claims against or interests in the Debtors and the rights of the Debtors in connection therewith.  If the Plan is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

9.14.    Several, Not Joint, Obligations.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

9.15.    Remedies.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

9.16.    Specific Performance.    This Agreement is intended as a binding commitment enforceable in accordance with its terms against the Parties.  It is understood and agreed by each of the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled solely to specific performance and injunctive or other equitable relief as a remedy of any such breach.

9.17.    No Third-Party Beneficiaries.    Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

9.18.    <u>Automatic Stay</u>.    The Parties agree and acknowledge that the giving of notice or termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code.  The Debtors waive any rights to assert that the exercise of such rights violate the automatic stay, or any other provisions of the Bankruptcy Code.

9.19.    <u>Settlement Discussions</u>.    This Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

9.20.    <u>Consideration</u>.    The Parties hereby acknowledge that no consideration, other than that specifically described herein, the Plan and the Definitive Documents shall be due or paid to any Party for its agreements hereunder.

*[Signatures Follow]*

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their respective and duly authorized officers or other agents, solely in their respective capacity as officers or other agents of the undersigned and not in any other capacity, as of the date first set forth above.

PACIFIC SUNWEAR OF CALIFORNIA, INC.

By: _____

Name:  Craig E. Gosselin

Title:  Senior Vice President, Secretary, General Counsel, and Human Resources


PACIFIC SUNWEAR STORES CORP.

By: _____

Name:  Craig E. Gosselin

Title:  President and Secretary


MIRALOMA BORROWER CORPORATION

By: _____

Name:  Craig E. Gosselin

Title:  President and Secretary


[Signature Page to Restructuring Support Agreement]

PS HOLDINGS AGENCY CORP., as Consenting
Term Loan Agent

By: _____

Name: _____

Title: _____

PS HOLDINGS OF DELAWARE, LLC -
SERIES A AND PS HOLDINGS OF
DELAWARE, LLC - SERIES B, as
Consenting Term Loan Lenders


By: _____

Name: _____

Title: _____

## Exhibit A

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PACIFIC SUNWEAR OF CALIFORNIA, INC., *et al.*,[1] | ) Case No. 16-10882 (  ) |
| | ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**JOINT PLAN OF REORGANIZATION OF
PACIFIC SUNWEAR OF CALIFORNIA, INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Michael L. Tuchin, Esq.
David M. Guess, Esq.
Jonathan M. Weiss, Esq.
Sasha M. Gurvitz, Esq.
**KLEE, TUCHIN, BOGDANOFF & STERN LLP**
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Telephone:      (310) 407-4029
Facsimile:      (310) 407-9090
E-mail:        mtuchin@ktbslaw.com
               dguess@ktbslaw.com
               jweiss@ktbslaw.com
               sgurvitz@ktbslaw.com

Michael R. Nestor, Esq. (Bar No. 3526)
Joseph M. Barry (Bar No. 4221)
Maris J. Kandestin (Bar No. 5294)
Shane M. Reil (Bar No. 6195)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
E-mail:        mnestor@ycst.com
               jbarry@ycst.com
               mkandestin@ycst.com
               sreil@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated:  April 7, 2016

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Pacific Sunwear of California, Inc. (9463-CA); Miraloma Borrower Corporation (0381-Del.); and Pacific Sunwear Stores Corp. (5792-CA).  The Debtors' address is 3450 East Miraloma Avenue, Anaheim, CA 92806.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW .................................................................................................................1

    A.    Defined Terms ..............................................................................................1
    B.    Rules of Interpretation ...............................................................................11
    C.    Computation of Time .................................................................................11
    D.    Governing Law ...........................................................................................11
    E.    Reference to Monetary Figures ..................................................................11
    F.    Reference to the Debtors or the Reorganized Debtors ...............................12

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS AND PRIORITY TAX CLAIMS ..........12

    A.    Administrative Claims ................................................................................12
    B.    DIP Facility Claims ...................................................................................13
    C.    Priority Tax Claims ....................................................................................13
    D.    Statutory Fees .............................................................................................13

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................................13

    A.    Classification of Claims and Interests .......................................................13
    B.    Summary of Classification .........................................................................14
    C.    Treatment of Claims and Interests ............................................................14
    D.    Acceptance or Rejection of the Plan .........................................................18
    E.    Special Provision Governing Claims that are Not Impaired ......................18
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ...................19
    G.    Subordinated Claims ..................................................................................19
    H.    Elimination of Vacant Classes ..................................................................19
    I.    Intercompany Claims and Intercompany Interests. ...................................19

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................................................19

    A.    Restructuring Transactions ........................................................................19
    B.    Reorganized Parent ....................................................................................20
    C.    Sources of Consideration for Plan Distributions. ......................................20
    D.    Corporate Existence ...................................................................................20
    E.    Vesting of Assets in the Reorganized Debtors ..........................................20
    F.    Cancellation of Securities and Agreements ..............................................21
    G.    Corporate Action ........................................................................................21
    H.    New Organizational Documents ................................................................22
    I.    Directors, Managers, and Officers of the Reorganized Debtors................22
    J.    Effectuating Documents; Further Transactions .........................................22
    K.    Section 1146 Exemption ............................................................................22
    L.    Director and Officer Liability Insurance; Other Insurance .......................22
    M.    Preservation of Causes of Action ..............................................................23
    N.    Section 1145 Exemption ............................................................................23

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................24

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ...................24
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.................24
    C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.................24
    D.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.................25
    E.    Reservation of Rights .................................................................................25
    F.    Nonoccurrence of Effective Date ..............................................................26

i

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................26
    A.    Timing and Calculation of Amounts to Be Distributed ................................26
    B.    Disbursing Agent ................................................................................26
    C.    Rights and Powers of Disbursing Agent ..................................................26
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.......26
    E.    Compliance with Tax Requirements .......................................................27
    F.    Allocations .......................................................................................27
    G.    Setoffs and Recoupment .....................................................................27
    H.    Claims Paid or Payable by Third Parties .................................................27

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS .........................................................................................................28
    A.    Allowance of Claims..........................................................................28
    B.    Claims Administration Responsibilities...................................................28
    C.    Estimation of Claims..........................................................................28
    D.    Adjustment to Claims Without Objection ................................................29
    E.    Time to File Objections to Claims .........................................................29
    F.    Disallowance of Claims.......................................................................29
    G.    Amendments to Claims .......................................................................29
    H.    No Distributions Pending Allowance ......................................................29
    I.    Distributions After Allowance ..............................................................29

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS .............30
    A.    Compromise and Settlement of Claims, Interests and Controversies ...........30
    B.    Discharge of Claims and Termination of Interests....................................30
    C.    Release of Liens ................................................................................30
    D.    Releases by the Debtors ......................................................................30
    E.    Releases by Holders ...........................................................................31
    F.    Exculpation .....................................................................................32
    G.    Injunction .......................................................................................32
    H.    Term of Injunctions or Stays ...............................................................33

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN...........................................................................................................................33
    A.    Conditions Precedent to Confirmation ...................................................33
    B.    Conditions Precedent to the Effective Date .............................................33
    C.    Waiver of Conditions .........................................................................34
    D.    Effect of Failure of Conditions .............................................................34

ARTICLE X. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .....................34
    A.    Modification and Amendments..............................................................34
    B.    Effect of Confirmation on Modifications.................................................35
    C.    Revocation or Withdrawal of Plan ........................................................35

ARTICLE XI. RETENTION OF JURISDICTION .....................................................................35

ARTICLE XII. MISCELLANEOUS PROVISIONS ...................................................................37
    A.    Immediate Binding Effect....................................................................37
    B.    Additional Documents.........................................................................37
    C.    Statutory Committee and Cessation of Fee and Expense Payment ...............37
    D.    Reservation of Rights.........................................................................37
    E.    Successors and Assigns.......................................................................37

F.   Notices ...................................................................................................................... 37
G.   Entire Agreement ...................................................................................................... 39
H.   Exhibits ...................................................................................................................... 39
I.   Severability of Plan Provisions ............................................................................... 39
J.   Votes Solicited in Good Faith ................................................................................. 39
K.   Closing of Chapter 11 Cases ................................................................................... 39
L.   Conflicts ..................................................................................................................... 39

iii

## INTRODUCTION

Pacific Sunwear of California, Inc. and its debtor affiliates, as debtors and debtors in possession propose this joint plan of reorganization pursuant to chapter 11 of the Bankruptcy Code.[2]  This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, as well as a summary and description of this Plan.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.      "***ABL Agent***" means Wells Fargo Bank, National Association, in its respective capacities as administrative agent and collateral agent under the ABL Credit Agreement.

2.      "***ABL Claims***" means Claims in favor of the ABL Lender arising under the ABL Credit Agreement.

3.      "***ABL Credit Agreement***" means that certain Credit Agreement dated as of December 7, 2011, by and among Pacific Sunwear of California, Inc., as lead borrower, the other borrowers thereto, the guarantors party thereto, the lenders party thereto and the ABL Agent.

4.      "***ABL Facility***" means that certain secured revolving credit facility under the ABL Credit Agreement.

5.      "***ABL Lender***" means Wells Fargo Bank, National Association, in its capacity as lender under the ABL Credit Agreement.

6.      "***Accrued Professional Compensation Claim***" means any Claim on account of accrued, contingent, and/or unpaid fees and expenses for legal, financial advisory, accounting, and other services and reimbursement of expenses through the Effective Date that are awardable and allowable under sections 328, 330, 331, or 1103 of the Bankruptcy Code by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by Final Order, (a) to the extent that any such fees and expenses have not been previously paid and (b) after applying any unapplied retainer that has been provided to such Professional.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer give rise to any Accrued Professional Compensation Claim.

7.      "***Administrative Claim***" means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code; and (c) all requests for compensation or expense reimbursement for

---

[2]      Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

1

making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

8.        "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

9.        "*Allowed*" means with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is scheduled by the Debtors as not disputed, contingent, or unliquidated and for which no Proof of Claim, objection or request for estimation has been timely Filed on or before any applicable objection deadline (including the Claims Objection Deadline), if any, set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court; (b) a Claim that is not a Disputed Claim on or before the Claims Objection Deadline (as the same may be extended from time to time) or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; or (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors or the Reorganized Debtors, as the case may be, pursuant to a Final Order of the Bankruptcy Court; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Except for any Claim that is expressly Allowed herein, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

10.        "*Assumed Executory Contract and Unexpired Lease List*" means the list (as may be amended), if any, as determined by the Debtors and the Winning Bidder, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the provisions of Article V of the Plan and which shall be included in the Plan Supplement, and which list, for the avoidance of doubt, must include the Employee Plans.

11.        "*Auction*" means the auction, if any, for all or substantially all of the Debtors' assets, conducted in accordance with the Bidding Procedures.

12.        "*Avoidance Actions*" means any and all Causes of Action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

13.        "*Ballot*" means the form approved by the Bankruptcy Court and distributed to Holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan.

14.        "*Bankruptcy Code*" means chapter 11 of title 11 of the United States Code.

15.        "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

16.        "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

17.        "*Bidding Procedures*" means the procedures governing the auction and sale of all or substantially all of the Debtors' assets, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

18.        "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

19.        "*Cash*" means the legal tender of the United States of America.

20.    "*Causes of Action*" means any action, claim, interest, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, remedy, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable, directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

21.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under case number 16-10882 (   ).

22.    "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

23.    "*Claims Bar Date*" means the date or dates to be established by the Bankruptcy Court by which Proofs of Claim must be Filed.

24.    "*Claims Objection Deadline*" means the latest of (a) ninety (90) days after the Effective Date, (b) thirty (30) days after entry of a Final Order under section 502(j) of the Bankruptcy Code reinstating any Claim previously disallowed, (c) ninety (90) days after the filing of a Claim or any amendment to any Claim, or (d) such other later date as is established by order of the Bankruptcy Court.

25.    "*Claims Register*" means the official register of Claims maintained by the Notice, Claims, and Balloting Agent.

26.    "*Class*" means a class of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

27.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A having been satisfied or waived pursuant to Article IX.C.

28.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

29.    "*Confirmation Hearing*" means the confirmation hearing held by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

30.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

31.    "*Consummation*" means the occurrence of the Effective Date.

32.    "*Credit Bid*" means any bid for all or substantially all of the Debtors' assets submitted in accordance with the Bidding Procedures, to the extent the consideration under such bid consists of the offset of Secured Claims against the proposed purchase price in accordance with section 363(k) of the Bankruptcy Code.

33.    "*Creditors' Committee*" means the statutory committee of unsecured creditors, if any, appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

3

34.      "*Cure Claim*" means a Claim, if any, in connection with the assumption or assumption and assignment of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable law.

35.      "*Cure Notice*" means a notice, if any, of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

36.      "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

37.      "*Debtors*" means, collectively: (a) Parent; (b) PS Stores; and (c) Miraloma.

38.      "*DIP Agent*" means Wells Fargo Bank, National Association, in its respective capacities as administrative agent and collateral agent under the DIP Facility Credit Agreement, together with its respective successors and assigns in such capacities.

39.      "*DIP Facility*" means that senior secured superpriority debtor-in-possession credit facility, comprised of a revolving credit facility in an aggregate principal amount that, when aggregated with the revolving exposure outstanding under the ABL Credit Agreement, shall not exceed $100,000,000.

40.      "*DIP Facility Claim*" means any Claim derived from, based upon, relating to, or arising from the DIP Facility Credit Agreement.

41.      "*DIP Facility Credit Agreement*" means the agreement governing the DIP Facility, dated as of April 7, 2016, among the Debtors, the DIP Agent and the DIP Lenders (as amended, restated, supplemented, or otherwise modified from time to time), as well as any other documents entered into in connection therewith, which such documents shall be in form and substance acceptable to the DIP Agent, the DIP Lenders, and the Term Loan Lenders in their respective sole discretion.

42.      "*DIP Lenders*" means the banks, financial institutions, and other lenders party to the DIP Facility Credit Agreement from time to time.

43.      "*DIP Order*" means any interim order (or orders) and the final order of the Bankruptcy Court, each in form and substance acceptable to the DIP Agent, the DIP Facility Lenders, and the Term Loan Lenders in their respective sole discretion, authorizing, *inter alia,* the Debtors to enter into the DIP Facility Credit Agreement and incur postpetition obligations thereunder.

44.      "*Disbursing Agent*" means the Debtors and/or the Reorganized Debtors (as applicable), or the Entity or Entities selected by the Debtors and/or the Reorganized Debtors and identified in the Plan Supplement, to make or facilitate distributions contemplated under the Plan.

45.      "*Disclosure Statement*" means the *Disclosure Statement for the Joint Plan of Reorganization of Pacific Sunwear of California, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,* dated April 7, 2016, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law, and which shall be in form and substance acceptable to the Term Loan Lenders in their sole discretion.

46.      "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is (a) disputed under the Plan, or subject, or potentially subject, to a timely objection and/or request for estimation in accordance

4

with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (b) improperly asserted, by the untimely or otherwise improper filing of a Proof of Claim as required by order of the Bankruptcy Court or (c) that is disallowed pursuant to section 502(d) of the Bankruptcy Code.  A Claim that is Disputed as to its amount shall not be Allowed in any amount for purposes of distribution until it is no longer a Disputed Claim.

47.    "*Distribution*" means any distribution provided for in the Plan by the Debtors or the Reorganized Debtors, as applicable, to Holders of Allowed Claims in full or partial satisfaction of such Allowed Claims.

48.    "*Distribution Record Date*" means the date that is the Confirmation Date.

49.    "*Effective Date*" means the date selected by the Debtors and the Winning Bidder that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been met or waived pursuant to Article IX.B and Article IX.C and (b) no stay of the Confirmation Order is in effect.

50.    "*Employee Plans*" means (i) the Debtors' Key Employee Incentive Plan (ii) the Debtors' Key Employee Retention Plan, (iii) the Fiscal 2016 Bonus Plan, and (iv) any severance policy maintained by the Debtors.

51.    "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

52.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

53.    "*Exculpated Claim*" means any Claim related to any act or omission derived from, based upon, related to or arising from the Debtors' in or out-of-court reorganization efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, filing, confirmation, approval, implementation, or administration of the Restructuring Support Agreement (and related prepetition transactions), the Disclosure Statement, the Plan (including any term sheets related thereto), the property to be distributed under the Plan or any contract, instrument, release or other agreement  (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion)  or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation and Consummation and the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement.

54.    "*Exculpated Party*" means each of:  (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL Lender; (d) the ABL Agent; (e) the Term Loan Lenders; (f) the Term Loan Agent; (g) the DIP Lenders; (h) the DIP Agent; (i) the New ABL Lenders; (j) the New ABL Agent; (k) Holders of Series B Preferred Stock and/or any other Parent Interests into which any such shares of Series B Preferred Stock have been converted; and (h) with respect to the entities in clauses (a) through (k), such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

55.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

56.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

57.    "*File*" or "*Filed*" means file or filed with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

58.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

59.    "*First Administrative Claims Bar Date*" means the date by which all requests for payment of Administrative Claims accruing through and including July 31, 2016 must be Filed and served on the Reorganized Debtors, which date shall be August 15, 2016.

60.    "*Fiscal 2016 Bonus Plan*" means the Debtors' bonus plan for fiscal year 2016 as adopted by Parent's board of directors on or about March 17, 2016.

61.    "*General Unsecured Claim*" means any Unsecured Claim, including any claim arising from the rejection of a non-residential lease or executory contract, which is not a Mortgage Notes Claim, Intercompany Claim, or Qualified Unsecured Trade Claim; *provided*, for the avoidance of doubt, that General Unsecured Claims include the deficiency portion of the Term Loan Claims against Parent, PS Stores, and Miraloma.

62.    "*General Unsecured Claims Recovery Pool*" means $400,000 in Cash.

63.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

64.    "*Holder*" means any Entity holding a Claim or Interest.

65.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

66.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

67.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

68.    "*Interests*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

69.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

70.    "*License Agreements*" means (i) the License Agreement with Pacific Sunwear of California, dated August 14, 2014, by and between Pacific Sunwear of California, Inc. and YYGM S.A. and (ii) the Service, Supply and Purchase Agreement, dated July 1, 2012, by and between Pacific Sunwear of California, Inc. and 3072541 Canada Inc.

71.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

72.    "*Miraloma*" means Miraloma Borrower Corporation.

73.    "*Miraloma Mortgage Note*" means the Deed of Trust, Assignment of Rents and Security Agreement by Miraloma Borrower Corporation to the order of American National Insurance Company dated August 20, 2010, as amended.

74.    "*Mortgage Notes*" means the Miraloma Mortgage Note and the PS Stores Mortgage Note.

6

75.     "*Mortgage Notes Claim*" means Secured Claims in the aggregate amount of $27,353,758 derived from, based upon, relating to, or arising from the Mortgage Notes.

76.     "*New ABL Agent*" means the administrative agent and collateral agent under the New ABL Facility.

77.     "*New ABL Facility*" means the revolving credit facility to be provided pursuant to the New ABL Facility Credit Agreement.

78.     "*New ABL Facility Credit Agreement*" means the loan agreement, to be dated as of the Effective Date that will govern the New ABL Facility, the form of which shall be included in the Plan Supplement.

79.     "*New Board*" means the initial board of directors, members, or managers, as applicable, of Reorganized Parent, to be selected by the Winning Bidder in their sole discretion.

80.     "*New Money Investment*" means the $20 million investment to be made by the Term Loan Lenders or their Affiliates if the Term Loan Lenders are the Winning Bidder, which shall take the form of either debt or equity, or a combination of debt and equity, on terms mutually agreed upon by the Debtors and either the Term Loan Lenders or their Affiliates (as applicable), to be determined at the time of the Filing of the Plan Supplement.

81.     "*New Organizational Documents*" means such certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Debtors, the forms of which will be included in the Plan Supplement and which shall be in form and substance acceptable to the Winning Bidder in its sole discretion.

82.     "*New Parent Interests*" means the Interests to be issued by Reorganized Parent under the Plan.

83.     "*New Term Loan*" means a secured term loan in the amount of $30 million pursuant to the New Term Loan Credit Agreement.

84.     "*New Term Loan Credit Agreement*" means the loan agreement, to be dated as of the Effective Date that will govern the New Term Loan, the form of which shall be included in the Plan Supplement.

85.     "*Notice, Claims and Balloting Agent*" means Prime Clerk LLC.

86.     "*Other Secured Claim*" means any Secured Claim that is not a DIP Facility Claim, an ABL Claim, a Mortgage Notes Claim, or a Term Loan Claim.

87.     "*Parent*" means Pacific Sunwear of California, Inc.

88.     "*Parent Interests*" means the Interests in Parent outstanding as of the Petition Date.

89.     "*Person*" means a person as such term as defined in section 101(41) of the Bankruptcy Code.

90.     "*Petition Date*" means April 7, 2016, the date on which each of the Debtors commenced the Chapter 11 Cases.

91.     "*Plan*" means this *Joint Plan of Reorganization of Pacific Sunwear of California, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference.

92.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed no later than seven (7) days before the Confirmation Hearing, which documents shall be in form and substance acceptable to the Winning Bidder in their sole discretion, on notice to parties in interest,

7

and additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date with the advance written consent of the Winning Bidder.

93.    "*Priority Non-Tax Claims*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

94.    "*Priority Tax Claim*" means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

95.    "*Professional*" means an Entity:    (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; *provided*, for the avoidance of doubt, that any Entity employed by the Debtors in the ordinary course, including pursuant to any order of the Bankruptcy Court authorizing such ordinary course employment, shall not be a Professional.

96.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

97.    "*Pro Rata*" means the proportion that (a) an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class or (b) Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

98.    "*PS Stores*" means Pacific Sunwear Stores Corp.

99.    "*PS Stores Mortgage Note*" means the Mortgage, Security Agreement, Financing Statement and Fixture Filing by Pacific Sunwear Stores Corp. to the order of American National Insurance Company, dated August 10, 2010, as amended.

100.    "*Qualified Unsecured Trade Claim*" means all Unsecured Claims directly relating to and arising solely from the receipt of goods and services by the Debtors arising with, and held by, Entities with whom the Debtors are conducting, and with whom the Reorganized Debtors elect to continue to conduct, business as of the Effective Date, which Entities shall have executed a Qualified Vendor Support Agreement prior to or on the date that is forty-five (45) days after the Petition Date; *provided*, *however*, that Qualified Unsecured Trade Claims shall not include Administrative Claims, Other Priority Claims, or Claims of any non-Debtor counterparty to a rejected Executory Contract or Unexpired Lease (which Claims of any non-Debtor counterparty to a rejected Executory Contract or Unexpired Lease for rejection damages shall be deemed General Unsecured Claims).

101.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

102.    "*Rejected Executory Contract and Unexpired Lease List*" means the list (as may be amended), as determined by the Debtors and the Winning Bidder, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors or the Reorganized Debtors (as applicable) pursuant to the provisions of Article V and which shall be included in the Plan Supplement.

103.    "*Rejection Claim*" means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

104.    "*Released Party*" means each of:    (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL Lender; (d) the ABL Agent; (e) the Term Loan Lenders; (f) the Term Loan Agent; (g) Holders of Series B Preferred Stock and/or any other Parent Interests into which any such shares of Series B Preferred Stock have been converted;

(h) the DIP Facility Lenders; (i) the DIP Agent; (j) the New ABL Agent; (k) the New ABL Lender; (l) the Winning Bidder; and (m) with respect to the entities in clauses (a) through (l), such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

105. "*__Releasing Parties__*" means, collectively, (a) the Debtors; (b) the Reorganized Debtors; (c) ABL Lender; (d) the ABL Agent; (e) the Term Loan Lenders; (f) the Term Loan Agent; (g) Holders of Series B Preferred Stock and/or any other Parent Interests into which any such shares of Series B Preferred Stock have been converted; (h) the DIP Facility Lenders; (i) the DIP Agent; (j) the New ABL Agent; (k) the New ABL Lender; (l) the Winning Bidder; (m) all Holders of Claims that vote to accept or are deemed to accept the Plan; (n) all Holders of Claims entitled to vote for or against the Plan who abstain from voting and who do not opt out of the releases provided for in the Plan; (o) all Holders of Claims and Interests to the maximum extent permitted by law; and (p) with respect to each of the entities named in (a)–(o) above, such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

106. "*__Reorganized Debtors__*" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

107. "*__Reorganized Parent__*" means Parent, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

108. "*__Restructuring Support Agreement__*" means the agreement, effective as of April 6, 2016, by and among the Debtors, the Term Loan Agent, and the Term Loan Lenders, pursuant to which such parties agreed (subject to certain conditions specified therein) to support the Plan.

109. "*__Restructuring Transactions__*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors or the Reorganized Debtors determine to be necessary or appropriate to effect a restructuring of a Debtor's business or a restructuring of the overall corporate structure of the Reorganized Debtors, whether implemented before, on or after the Effective Date.

110. "*__Schedules__*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified, or supplemented from time to time.

111. "*__Second Administrative Claims Bar Date__*" means the date by which all requests for payment of Administrative Claims accruing on or after August 1, 2016 through and including the Effective Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, which date shall be 30 days after the Effective Date.

112. "*__Section 510(b) Claim__*" means any Claim against the Debtors arising from rescission of a purchase or sale of a Security of any of the Debtors or an Affiliate of any of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

113.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

114.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as amended, together with the rules and regulations promulgated thereunder.

115.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78nn, as amended.

116.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

117.    "*Series B Preferred Stock*" means those certain Series B preferred equity shares in Parent.

118.    "*Tax*" means (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental, or other tax, assessment, or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax, or additional amount) imposed by any federal, state, or local taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined, or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

119.    "*Term Loan Agent*" means PS Holdings Agency Corp., in its capacities as administrative agent and collateral agent under the Term Loan Credit Agreement.

120.    "*Term Loan Claims*" means Claims in the aggregate amount of $88,064,943 derived from, based upon, relating to, or arising from the Term Loan Credit Agreement, assuming that all the loans under the Term Loan Credit Agreement were repaid on the Petition Date.

121.    "*Term Loan Credit Agreement*" means that certain Credit Agreement dated as of December 7, 2011, by and among Pacific Sunwear of California, Inc., as lead borrower, the guarantors party thereto, the Term Loan Lenders, and the Term Loan Agent, as amended by that certain First Amendment to the Credit Agreement, dated as of April 2, 2012, by and among Pacific Sunwear of California, Inc., the Term Loan Agent, and the Term Loan Lenders.

122.    "*Term Loan Lenders*" means, collectively, PS Holdings of Delaware, LLC - Series A and PS Holdings of Delaware, LLC - Series B, in their capacity as lenders under the Term Loan Credit Agreement, or any successor or assignee thereof.

123.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

124.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

125.    "*Unsecured Claim*" means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court.

126.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

127.    "*Voting Deadline*" means 4:00 p.m. (prevailing Eastern Time) on [_____], 2016.

10

128.    "***Winning Bidder***" means the Entity whose bid for all or substantially all of the Debtors' assets, which for the avoidance of doubt may include the transaction contemplated under the Plan, is selected by the Debtors and approved by the Bankruptcy Court as the highest or otherwise best bid pursuant to the Bidding Procedures.  For the avoidance of doubt, if no Qualified Bids (as defined in the Bidding Procedures) are submitted in accordance with the Bidding Procedures, the Term Loan Lenders shall be the Winning Bidder.

B.    *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or province of incorporation of the applicable Debtor or the Reorganized Debtors, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

*F.*     *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

*A.*     *Administrative Claims*

1.     Administrative Claims

Except with respect to Administrative Claims that are Accrued Professional Compensation Claims and except to the extent that a Holder of an Allowed Administrative Claim, on the one hand, and the Debtors and the Winning Bidder, on the other hand, agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash.  Such Claims shall be paid as soon as reasonably practicable after the reconciliation of all Disputed Administrative Claims; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements related thereto; and *provided further*, *however*, that the Reorganized Debtors shall pay Entities in the ordinary course of business for any work performed on and after the Effective Date in furtherance of the Plan or as authorized hereunder, in each case subject to any subsequent budget set forth in the Plan Supplement, as applicable. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

2.     Professional Compensation

(a)     *Accrued Professional Compensation Claims*

Professionals asserting a Accrued Professional Compensation Claim for services rendered before the Effective Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or any other applicable order of the Bankruptcy Court, an application for final allowance of such Accrued Professional Compensation Claim no later than 30 days after the Effective Date. Objections to any Accrued Professional Compensation Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.  Each Accrued Professional Compensation Claim allowed pursuant to such a final application shall be paid before the date that is ten (10) business days after entry by the Bankruptcy Court of an order allowing such Accrued Professional Compensation Claim.

12

3.     Administrative Claim Bar Date

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed on or before the applicable Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 75 days after the Effective Date.

B.     *DIP Facility Claims*

As of the Effective Date, the DIP Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement, including principal, interest, fees, and expenses.  On the Effective Date, the Holders of the DIP Facility Claims shall be paid in Cash in an amount equal to the amount of the DIP Facility Claims.

C.     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Effective Date, at the option of the Debtors and the Winning Bidder, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

D.     *Statutory Fees*

On the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, the Reorganized Debtors shall pay the applicable U.S. Trustee fees until the entry of a final decree in such Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.     *Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  All Claims and Interests, except for Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.    A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

01:18544829.1

B.    *Summary of Classification*

     The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, except as otherwise set forth below, the classifications for Classes 1 to 11 below shall be deemed to apply to each Debtor, as applicable. Certain classes with respect to certain Debtors may be vacant.

     The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Term Loan Claims | Impaired / Unimpaired | May be Entitled to Vote |
| 5A | Mortgage Notes Claims Against Parent | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5B | Mortgage Notes Claims Against PS Stores | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5C | Mortgage Notes Claims Against Miraloma | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | Qualified Unsecured Trade Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 10 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 11 | Parent Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

C.    *Treatment of Claims and Interests*

     To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

     1.    <u>Class 1 - Other Secured Claims</u>

         (a)    *Classification:*  Class 1 consists of Other Secured Claims.

         (b)    *Treatment:*  Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, as determined by the Debtors and the Winning Bidder:  (i)  payment in full in Cash, which shall be paid as

14

soon as reasonably practicable after the reconciliation of all Disputed Other Secured Claims; (ii) delivery of the collateral securing any such allowed secured claim; or (iii) other treatment such that the Allowed Other Secured Claim shall be rendered Unimpaired.

(c)     *Voting:* Class 1 Other Secured Claims are Unimpaired by the Plan, and Holders of such Class 1 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.     Class 2 - Priority Non-Tax Claims

(a)     *Classification*:  Class 2 consists of Priority Non-Tax Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash.  Allowed Priority Non-Tax Claims shall be paid as soon as reasonably practicable after the reconciliation of all Disputed Priority Non-Tax Claims.

(c)     *Voting*:  Class 2 Priority Non-Tax Claims are Unimpaired by the Plan, and Holders of such Class 2 Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 - ABL Claims

(a)     *Classification*:  Class 3 consists of the ABL Claims.

(b)     *Allowance*:  The ABL Claims shall be Allowed.

(c)     *Treatment*:   On the Effective Date, to the extent any ABL Claims are outstanding, Holders of the ABL Claims shall receive Cash in an amount equal to the amount of outstanding Allowed ABL Claims.

(d)     *Voting*:  Class 3 ABL Claims are Unimpaired by the Plan and Holders of such Class 3 ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

4.     Class 4 - Term Loan Claims

(a)     *Classification*:  Class 4 consists of the Term Loan Claims.

(b)     *Allowance*: The Term Loan Claims shall be Allowed.

(c)     *Treatment:*  On the Effective Date, in exchange for full and final satisfaction, settlement, release, and discharge of the Term Loan Claims, either (i) if the Holders of the Term Loan Claims are the Winning Bidder on account of their Credit Bid of such Claims, the Holders of the Term Loan Claims shall receive 100 percent of the New Parent Interests and the New Term Loan; or (ii) if the Term Loan Lenders are not the Winning Bidder, the Holders of the Term Loan Claims shall receive Cash in an amount equal to the amount of Allowed Term Loan Claims.

15

(d)    *Voting*:  If the Holders of the Term Loan Claims receive the treatment in subsection (c)(i) above, Class 4 Term Loan Claims are Impaired by the Plan, and Holders of such Class 4 Term Loan Claims are entitled to vote to accept or reject the Plan.  If the Holders of the Term Loan Claims receive the treatment in subsection (c)(ii) above, Class 4 Term Loan Claims are Unimpaired by the Plan and Holders of such Class 4 Term Loan Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

5.    Class 5A - Mortgage Notes Claims Against Parent

(a)    *Classification*:  Class 5A consists of all Mortgage Notes Claims against Parent.

(b)    *Treatment*:  Mortgage Notes Claims against Parent will be reinstated as of the Effective Date.

(c)    *Voting*:  Class 5A Mortgage Notes Claims against Parent are Unimpaired, and Holders of such Class 5A Mortgage Notes Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5A Mortgage Notes Claims are not entitled to vote to accept or reject the Plan.

6.    Class 5B - Mortgage Notes Claims Against PS Stores

(a)    *Classification*:  Class 5B consists of all Mortgage Notes Claims against PS Stores.

(b)    *Treatment*:  Mortgage Notes Claims against PS Stores will be reinstated as of the Effective Date.

(c)    *Voting*:  Class 5B Mortgage Notes Claims against PS Stores are Unimpaired, and Holders of such Class 5B Mortgage Notes Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5B Mortgage Notes Claims are not entitled to vote to accept or reject the Plan.

7.    Class 5C - Mortgage Notes Claims Against Miraloma

(a)    *Classification*:  Class 5C consists of all Mortgage Notes Claims against Miraloma.

(b)    *Treatment*:  Mortgage Notes Claims against Miraloma will be reinstated as of the Effective Date.

(c)    *Voting*:  Class 5C Mortgage Notes Claims against Miraloma are Unimpaired, and Holders of such Class 5C Mortgage Notes Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5C Mortgage Notes Claims are not entitled to vote to accept or reject the Plan.

8.    Class 6 - Qualified Unsecured Trade Claims

(a)    *Classification*:  Class 6 consists of all Qualified Unsecured Trade Claims against the Debtors.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Qualified Unsecured Trade Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Qualified Unsecured Trade Claim, each Holder of an Allowed Qualified Unsecured Trade Claim shall receive payment in full on account of such Qualified Unsecured Trade Claim in the following manner: (i) 50% of the such Allowed Qualified Unsecured Trade Claims to be paid on the

16

Effective Date; and (ii) 50% of the Allowed Qualified Unsecured Trade Claim to be paid on December 15, 2016 the later; *provided*, *however*, that Holders of Qualified Unsecured Trade Claims are not entitled to postpetition interest, late fees, or penalties on account of such Claims.

(c)     *Voting*:    Class 6 Qualified Unsecured Trade Claims are Impaired under the Plan. Therefore, Holders of such Qualified Unsecured Trade Claims are entitled to vote to accept or reject the Plan.

9.     Class 7 – General Unsecured Claims

(a)     *Classification:*  Class 7 consists of General Unsecured Claims.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Class 7 General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the each Allowed Class 7 General Unsecured Claim, each Holder of an Allowed Class 7 General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claims Recovery Pool; *provided* that, on the Effective Date, Holders of the deficiency portion of the Term Loan Claims against Parent, PS Stores and Miraloma shall be deemed to have waived their right to receive any distribution from the Class 7 General Unsecured Claims Recovery Pool on account of such deficiency portion of the Term Loan Claims against Parent, PS Stores and Miraloma.  Allowed Class 7 General Unsecured Claims shall be paid as soon as reasonably practicable after the reconciliation of all Disputed Class 7 General Unsecured Claims.

(c)     *Voting:*  Class 7 General Unsecured Claims are Impaired under the Plan.  Therefore, Holders of such Class 7 General Unsecured Claims are entitled to vote to accept or reject the Plan.

10.     Class 8 - Section 510(b) Claims

(a)     *Classification:*  Class 8 consists of all Section 510(b) Claims.

(b)     *Treatment*:  On the Effective Date, all Claims in Class 8 shall be cancelled without any distribution.

(c)     *Voting:*  Class 8 Section 510(b) Claims are Impaired under the Plan, and Holders of such Class 8 Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 8 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

11.     Class 9 - Intercompany Claims

(a)     *Classification*:  Class 9 consists of all Intercompany Claims.

(b)     *Treatment*:  Intercompany Claims will be Reinstated as of the Effective Date.

(c)     *Voting*:  Class 9 Intercompany Claims are Unimpaired under the Plan, and the Holders of such Class 9 Intercompany Claims conclusively is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 9 Intercompany Claims are not entitled to vote to accept or reject the Plan.

17

12.    Class 10 - Intercompany Interests

    (a)    *Classification:*  Class 10 consists of all Intercompany Interests.

    (b)    *Treatment*:  Intercompany Interests will be Reinstated as of the Effective Date.

    (c)    *Voting*:  Class 10 Intercompany Interests are Unimpaired under the Plan, and the Holder of such Class 10 Intercompany Interests conclusively is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holder of Class 10 Intercompany Interests is not entitled to vote to accept or reject the Plan.

13.    Class 11 - Parent Interests

    (a)    *Classification:*  Class 11 consists of Parent Interests.

    (b)    *Treatment:*  Holders of Parent Interests shall not receive any distribution on account of such Interests.  On the Effective Date, Parent Interests shall be cancelled and discharged.

    (c)    *Voting:*  Class 11 Parent Interests are Impaired and Holders of such Class 11 Parent Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 11 Parent Interests are not entitled to vote to accept or reject the Plan.

D.    *Acceptance or Rejection of the Plan*

1.    Voting Classes

Classes 6 and 7 are Impaired under the Plan.  Each Holder of a Claim in such Classes is entitled to vote to accept or reject the Plan.  Class 4 may be Impaired under the Plan if not paid in full in cash and in such case each Holder of a Claim in such Class is entitled to vote to accept or reject the Plan.

2.    Presumed Acceptance of the Plan

Classes 1, 2, 3, 5A, 5B, 5C, 9 and 10 are Unimpaired under the Plan.  Each Holder of a Claim in such Classes is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

3.    Presumed Rejection of Plan

Classes 8 and 11 are Impaired and shall receive no distribution under the Plan.  Each Holder of a Claim or Interest in such Classes is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

E.    *Special Provision Governing Claims that are Not Impaired*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are not Impaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are not Impaired.  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

F.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

G.      *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

H.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

I.      *Intercompany Claims and Intercompany Interests.*

Distributions on account of Intercompany Claims and Intercompany Interests are not being received by Holders of such Intercompany Claims and Intercompany Interests on account of such Intercompany Claims and Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Parent Interests.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Restructuring Transactions*

On or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall enter into the Restructuring Transactions and shall take any actions as may be necessary or appropriate to effect a restructuring of the corporate and capital structure of the Reorganized Debtors, as and to the extent provided therein.  The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors or the Reorganized Debtors, as applicable, to be necessary or appropriate.  The actions to effect the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions, regardless of whether such actions are taken on or after the Effective Date.

19

*B.      Reorganized Parent*

On the Effective Date, the New Board of Reorganized Parent shall be established, and Reorganized Parent shall adopt its New Organizational Documents. The Reorganized Debtors shall be authorized to implement the Restructuring Transactions and adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary or desirable to consummate the Plan, which actions, regardless of whether taken before, before, on or after the Effective Date, shall be deemed to constitute a Restructuring Transaction.

*C.      Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan with Cash on hand, including Cash from operations, as well as the following sources of consideration.

1.   <u>New ABL Facility</u>

On the Effective Date, the Reorganized Debtors shall enter into the New ABL Facility. The Reorganized Debtors shall use proceeds of the New ABL Facility to fund ongoing operations and obligations under the Plan, including to pay or refinance the DIP Facility Claims and the ABL Claims in full in cash.

2.   <u>New Money Investment</u>

On the Effective Date, if the Term Loan Lenders are the Winning Bidder, the Reorganized Debtors shall receive the New Money Investment. The Reorganized Debtors shall use proceeds of the New Money Investment to fund ongoing operations.

3.   <u>Issuance of New Parent Interests</u>

The issuance of the New Parent Interests by Reorganized Parent is authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests.

All of the units of New Parent Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

*D.      Corporate Existence*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other similar formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other similar formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

*E.      Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan,

20

each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the ABL Credit Agreement, the Term Loan Credit Agreement, and any other Certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, that notwithstanding Confirmation or Consummation, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors; *provided further*, *however*, that the foregoing shall not effect the cancellation of shares issued pursuant to the Restructuring Transactions nor any other shares held by one Debtor in the capital of another Debtor; *provided further, however*, that the foregoing shall not impact or cancel the New ABL Facility.  Notwithstanding the foregoing, no executory contract or unexpired lease that (i) has been, or will be, assumed pursuant to Section 365 of the Bankruptcy Code, (ii) relating to a claim pursuant to which any of the Debtors has entered into a Qualified Vendor Support Agreement, or (iii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

G.      *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (1) selection of the directors and officers for the Reorganized Debtors; (2) the issuance of the New Parent Interests; (3) implementation of the Restructuring Transactions; (4) execution of the New ABL Facility Credit Agreement and any and all other agreements, documents, securities, and instruments relating thereto; and (5) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on or after the Effective Date involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan or corporate structure of the Debtors or Reorganized Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors.  Before, on or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New ABL Facility Credit Agreement and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.  The issuance of the New Parent Interests shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

H.      *New Organizational Documents*

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective state, province, or country of incorporation and their respective New Organizational Documents and any such action shall be deemed a Restructuring Transaction deemed to have occurred and be in effect on the Effective Date.

I.      *Directors, Managers, and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the initial boards of directors, including the New Boards, and the officers of each of the Reorganized Debtors shall be appointed by the Winning Bidder in accordance with the respective New Organizational Documents.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of any of the Reorganized Debtors.  To the extent any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

J.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan; *provided*, that, for the avoidance of doubt, the dissolution of PS Stores for tax purposes, the merger of PS Stores into Parent, conversion of PS Stores into a limited liability company, or any other transaction after the Effective Date shall be deemed a Restructuring Transaction deemed to have occurred and be in effect on the Effective Date.

K.      *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

L.      *Director and Officer Liability Insurance; Other Insurance*

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under the Debtors' tail coverage liability insurance (i.e., directors' and officers' liability insurance coverage that extends beyond the end of the policy period) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

The Debtors will maintain and, to the extent applicable, assume their directors' and officers', general liability, and other insurance policies.  The Debtors will list all current year insurance policies among the Assumed Executory Contracts and Unexpired Lease List.

*M.*     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IV.L hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, a Qualified Vendor Support Agreement, or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything to the contrary in the Plan, all Avoidance Actions, except than those elected to be preserved by the Winning Bidder in their sole discretion as set forth in the Plan Supplement, are hereby waived, relinquished, exculpated, released, compromised, and settled.

*N.*     *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of the New Parent Interests as contemplated by the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.  As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, the New Parent Interests are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Parent Interests through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Parent Interests under applicable securities laws.  The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Parent Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New ABL Facility or the New Parent Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

23

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume Filed on or before the Effective Date; (4) is identified on the Assumed Executory Contracts and Unexpired Lease List; or (5) is either of the License Agreements.

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Employee Plans shall be assumed by the Reorganized Debtors pursuant to the provisions of this Article V, provided, however, that in respect of any employee included in the Debtors' Key Employee Incentive Plan or Key Employee Retention Plan, the Fiscal 2016 Bonus Plan shall be assumed by the Reorganized Debtors only on a prorated basis for the period after the Effective Date (such that the bonus payable to any such employee under the Fiscal 2016 Bonus Plan shall equal (x) the bonus, if any, payable under the Fiscal 2016 Bonus Plan multiplied by (y) (i) the number of days between the Effective Date and the end of fiscal year 2016, divided by (ii) 365).

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases List, or the Rejected Executory Contract and Unexpired Leases List, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date or such later date as the Winning Bidder and an objecting counterparty may fix and agree and the Bankruptcy Court approves. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and unenforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan, as applicable.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates, and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article VIII hereof.**

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired

24

Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

At least seven (7) days before the deadline to object to confirmation of the Plan, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors by the deadline to object to confirmation of the Plan.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount; *provided, however*, the Debtors and the Winning Bidder, shall have the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Lease List or Rejected Executory Contracts and Unexpired Lease List, as applicable, as identified in the Plan Supplement, through and including the Effective Date (except that, notwithstanding anything to the contrary contained herein, no such alteration, amendment, modification, or supplement may remove any of the Employee Plans from the Assumed Executory Contracts and Unexpired Lease List).  To the extent that the Debtors and the Winning Bidder alter, amend, modify, or supplement the lists of Executory Contracts and Unexpired Lease included in the Plan Supplement, the Debtors will provide notice to each counterparty to an affected Executory Contract or Unexpired Lease within five days of such decision.  To the extent such alteration, amendment, modification, or supplement to the Assumed Executory Contracts and Unexpired Lease List identifies an Executory Contract or Unexpired Lease that was not previously on such list or reduces the calculation of a Cure Claim, the notice provided to each affected counterparty shall provide a deadline of not less than ten (10) Business Days from the date of service of such notice for such affected counterparty to object to the proposed assumption or related Cure Claim.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date of the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

E.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed or Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or

25

was executory or unexpired at the time of assumption or rejection, the Debtors and the Winning Bidder shall have 28 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VI.
# PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date, each Holder of an Allowed Claim shall receive such distributions that the Plan provides for Allowed Claims in each applicable Class in accordance with Article III hereof.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Voting Deadline.

B.    *Disbursing Agent*

Distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.    *Rights and Powers of Disbursing Agent*

1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Delivery of Distributions

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to Holders of Allowed Claims and Allowed Interests on the Effective Date at the address for each such Holder as indicated on the

Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

2.      Minimum Distributions

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $50 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claims against the Debtors or their property.

3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

F.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.      *Setoffs and Recoupment*

The Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

H.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Reorganized Debtors.  Subject to the last sentence of this

27

paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or

28

Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      Adjustment to Claims Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the Claims Objection Deadline (as may be extended by order of the Bankruptcy Court).

F.      Disallowance of Claims

Except as otherwise provided herein, any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit (or assume the agreement(s) providing such employee benefit), without any further notice to or action, order, or approval of the Bankruptcy Court.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

G.      Amendments to Claims

On or after the applicable bar date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.      No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder

29

is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

C.    *Release of Liens*

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

D.    *Releases by the Debtors*

ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, THE RELEASED PARTIES WILL

BE AND WILL BE DEEMED TO BE EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY RELEASED, ACQUITTED, AND DISCHARGED BY THE DEBTORS AND THEIR ESTATES AND THE REORGANIZED DEBTORS FROM ANY AND ALL ACTIONS, CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED (OR THAT COULD BE ASSERTED) ON BEHALF OF THE DEBTORS, THEIR ESTATES, OR THE REORGANIZED DEBTORS (AS APPLICABLE), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE DEBTORS' ESTATES OR THEIR AFFILIATES (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), THE DEBTORS' IN OR OUT OF COURT RESTRUCTURING EFFORTS, THE DIP CREDIT AGREEMENT, THE ABL CREDIT AGREEMENT, THE TERM LOAN CREDIT AGREEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE RESTRUCTURING, ANY PREFERENCE OR AVOIDANCE CLAIM PURSUANT TO SECTIONS 544, 547, 548, AND 549 OF THE BANKRUPTCY CODE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN SUPPLEMENT, ANY DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE ORDER CONFIRMING THE PLAN IN LIEU OF SUCH LEGAL OPINION), OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE OF THE PLAN, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD.

E.      *Releases by Holders*

        ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY, RELEASED, ACQUITTED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL ACTIONS, CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED (OR THAT COULD BE ASSERTED) ON BEHALF OF THE DEBTORS, THEIR ESTATES, OR THE REORGANIZED DEBTORS (AS APPLICABLE), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE OR OTHERWISE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), THE DEBTORS' IN OR OUT OF COURT RESTRUCTURING EFFORTS, THE DIP CREDIT AGREEMENT, THE ABL CREDIT AGREEMENT, THE TERM LOAN CREDIT AGREEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED

31

PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE RESTRUCTURING, THE NEGOTIATION, ANY PREFERENCE OR AVOIDANCE CLAIM PURSUANT TO SECTIONS 544, 547, 548, AND 549 OF THE BANKRUPTCY CODE, FORMULATION, OR PREPARATION OF THE PLAN, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN SUPPLEMENT, ANY DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE ORDER CONFIRMING THE PLAN IN LIEU OF SUCH LEGAL OPINION), OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE OF THE PLAN, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD; PROVIDED, HOWEVER, THAT INDEMNITY OBLIGATIONS UNDER THE DIP FACILITY AND THE OBLIGATIONS UNDER THE NEW ABL FACILITY SHALL NOT BE RELEASED HEREUNDER.

F.    *Exculpation*

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR PLAN SUPPLEMENT, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY EXCULPATED CLAIM, OBLIGATION, CAUSE OF ACTION OR LIABILITY FOR ANY EXCULPATED CLAIM, EXCEPT FOR ACTUAL FRAUD OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.  THE EXCULPATED PARTIES HAVE PARTICIPATED IN ANY AND ALL ACTIVITIES POTENTIALLY UNDERLYING ANY EXCULPATED CLAIM IN GOOD FAITH AND IN COMPLIANCE WITH ALL APPLICABLE LAWS.

G.    *Injunction*

**FROM AND AFTER THE EFFECTIVE DATE, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO Article VIII.D OR Article VIII.E OF THE PLAN, SHALL BE DISCHARGED PURSUANT TO ARTICLE VIII.B OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO Article VIII.F OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES:  (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF**

**SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.**

H.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**ARTICLE IX.
CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation that all provisions, terms, and conditions hereof are approved in the Confirmation Order.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      the Plan, the Confirmation Order, the New ABL Facility Credit Agreement and the New Term Loan Credit Agreement shall be in form and substance consistent in all material respects with the Restructuring Support Agreement and, to the extent the Plan, the Confirmation Order, the New ABL Facility Credit Agreement or the New Term Loan Credit Agreement contain terms not expressly contemplated by the Restructuring Support Agreement, otherwise acceptable in all respects to the Debtors and the Term Loan Lenders in their respective sole discretion, and each of the foregoing shall be in full force and effect;

2.      the assumption of the License Agreements shall have been approved by a Final Order of the Bankruptcy Court (or other court of competent jurisdiction), and any and all conditions to assumption thereof shall have been satisfied;

3.      the rejection of any Executory Contracts or Unexpired Leases identified for rejection shall have been approved by a Final Order of the Bankruptcy Court (or other court of competent jurisdiction), and any and all conditions to rejection thereof shall have been satisfied;

4.      the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall have become a Final Order;

5.      the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect and assumed in connection with Confirmation;

6.      all reasonable and documented fees and out-of-pocket costs and expenses of the ABL Agent, ABL Lender, Term Loan Agent, Term Loan Lenders, DIP Agent, DIP Lenders, New ABL Agent, and New ABL Lenders shall have been paid in full in cash by the Debtors;

7.      the amount of (a) non-ordinary course Allowed Administrative Claims shall not exceed an aggregate of $8.0 million, provided that, for the avoidance of doubt, ordinary course Administrative Claims include (i) Claims under section 503(b)(9) of the Bankruptcy Code, (ii) Claims in respect of postpetition payroll and

33

employee benefits, (iii) Claims by vendors or utility companies for postpetition goods and services, (iv) Accrued Professional Compensation Claims (including any "transaction fee"), (v) Claims for professional fees asserted by professionals employed by the lenders (including any "transaction fee"), (vi) Claims in respect of postpetition taxes, (vii) Claims by landlords for stub rent, (viii) Claims for accrued postpetition interest on the ABL Claims, the Term Loan Claims and Mortgage Notes, (ix) Claims for accrued postpetition royalties, (x) Claims for accrued obligations owing to the ABL Lender on account of postpetition payment card obligations, (xi) Claims in respect of gift cards purchased postpetition, (xii) Claims for any severance payment to any employees terminated postpetition, (xiii) Cure Claims, and (xiv) payments in respect of any key employee retention or incentive programs approved by the Court, in each case subject to the budget set forth in the DIP Order and to the exit budget; (b) non-ordinary course Allowed Priority Non-Tax Claims shall not exceed an aggregate of $1.0 million, provided that, for the avoidance of doubt, ordinary course Priority Non-Tax Claims include Claims in respect of prepetition payroll and employee benefits and Claims in respect of gift cards purchased prepetition, in each case as set forth and described in the motions filed by the Debtors on or about the Petition Date and subject to the budget set forth in the DIP Order and to the exit budget; and (c) Allowed Other Secured Claims shall not exceed an aggregate of $3.0 million, in each case unless otherwise agreed to by the Winning Bidder; and

8.    all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

C.    *Waiver of Conditions*

The conditions to Confirmation and to Consummation set forth in Article IX may be waived by the Debtors, with the advance written consent of the Winning Bidder, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.    *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, subject to the advance written consent of both the Term Loan Lenders and the Winning Bidder (if not the Term Loan Lenders), whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan, subject to the advance written consent of both the Term Loan Lenders and the Winning Bidder (if not the Term Loan Lenders), with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, provided, however, that no modification shall change the treatment of any of the DIP Agent, DIP Lenders, ABL Agent, or ABL Lender without such party or parties' consent in its or their sole and absolute discretion.

34

B.       *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of Plan*

The Debtors, subject to the advance written consent of both the Term Loan Lenders and the Winning Bidder (if not the Term Loan Lenders), reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors, subject to the advance written consent of both the Term Loan Lenders and the Winning Bidder (if not the Term Loan Lenders), revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.       allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.       decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Accrued Professional Compensation Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.       resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.       ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.       adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.       adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

35

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.H.1;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement or the Confirmation Order;

15.      enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.      consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

23.      enforce all orders previously entered by the Bankruptcy Court; and

24.      hear any other matter not inconsistent with the Bankruptcy Code.

36

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.B and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, which agreements and other documents shall be in form and substance acceptable to both the Term Loan Lenders and the Winning Bidder (if not the Term Loan Lenders).  The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the filing of applications for compensation.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committees after the Effective Date.

D.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

E.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      *Notices*

To be effective, all notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission).  Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

Pacific Sunwear of California, Inc.
3459 E. Miraloma Ave

37

Anaheim, California 92806
Attention:  Craig E. Gosselin, Esq.
E-mail address:  cgosselin@pacificsunwear.com

with copy to:

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Attention:  Michael L. Tuchin
E-mail addresses:  mtuchin@ktbslaw.com

- and -

PS Holdings of Delaware, LLC - Series A
One Embarcadero Center, 39th Floor
San Francisco, California 94111
Attn: Stephen Oetgen
E-mail address:  soetgen@goldengatecap.com

and

PS Holdings of Delaware, LLC - Series B
One Embarcadero Center, 39th Floor
San Francisco, California 94111
Attn: Stephen Oetgen, P.C.
E-mail address:  soetgen@goldengatecap.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Joshua A. Sussberg, P.C.
E-mail address:  jsussberg@kirkland.com

and

Kirkland & Ellis LLP
555 California Street
San Francisco, California 94104
Attn:  Melissa N. Koss
E-mail address:  melissa.koss@kirkland.com

After the Effective Date, the Reorganized Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.    *Entire Agreement*Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice, Claims, and Balloting Agent at https://cases.primeclerk.com/pacsun or the Bankruptcy Court's website at www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

I.    *Severability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the advance written consent of the Debtors, the Term Loan Lenders, and the Winning Bidder (if not the Term Loan Lenders); and (3) non-severable and mutually dependent.

J.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

K.    *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

L.    *Conflicts*

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement or any Order in the Chapter 11 Cases, or any agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; *provided*, *however*, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

*[Remainder of page intentionally left blank.]*

Dated:    April 7, 2016
          Wilmington, Delaware

PACIFIC SUNWEAR OF CALIFORNIA, INC.

By:       */s/ Craig E. Gosselin*
Name:     Craig E. Gosselin
Title:    Secretary, Senior Vice President, General Counsel, and
          Human Resources

PACIFIC SUNWEAR STORES CORP.

By:       */s/ Craig E. Gosselin*
Name:     Craig E. Gosselin
Title:    President and Secretary

MIRALOMA BORROWER CORPORATION

By:       */s/ Craig E. Gosselin*
Name:     Craig E. Gosselin
Title:    President and Secretary

COUNSEL:

Michael R. Nestor, Esq. (Bar No. 3526)            Michael L. Tuchin, Esq.
Joseph M. Barry, Esq. (Bar No. 4221)              David M. Guess, Esq.
Maris J. Kandestin, Esq. (Bar No. 5294)           Jonathan M. Weiss, Esq.
Shane M. Reil, Esq. (Bar No. 6195)                Sasha M. Gurvitz, Esq.
YOUNG CONAWAY STARGATT & TAYLOR, LLP              KLEE, TUCHIN, BOGDANOFF & STERN LLP
Rodney Square                                     1999 Avenue of the Stars, 39th Floor
1000 North King Street                            Los Angeles, CA 90067
Wilmington, Delaware 19801                        Tel:     (310) 407-4029
Tel:      (302) 571-6600                           Fax:     (310) 407-9090
Fax:      (302) 571-1253                           Email:   mtuchin@ktbslaw.com
Email: mnestor@ycst.com                                     dguess@ktbslaw.com
          jbarry@ycst.com                                   jweiss@ktbslaw.com
          mkandestin@ycst.com                               sgurvitz@ktbslaw.com
          sreil@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## Exhibit B

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| PACIFIC SUNWEAR OF CALIFORNIA, INC., *et al.*,[1] | Case No. 16-10882 (   ) |
| Debtors. | Joint Administration Requested |

## BIDDING PROCEDURES

By the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. __], dated _____, 2016 (the "***Bidding Procedures Motion***"),[2] Pacific Sunwear of California, Inc. and its subsidiaries, as debtors and debtors in possession (collectively, the "***Debtors***"), sought approval of, among other things, the procedures through which they will determine the highest or otherwise best offer for the purchase of (the "***Sale***") all of the Debtors' assets (the "***Assets***") or the new stock (the "***New Parent Interests***") of the reorganized Debtors (the "***Reorganized Debtors***").

On April [XX], 2016 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  On _____, 2016, the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") entered an order authorizing the joint administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

On the Petition Date, the Debtors filed a chapter 11 plan reorganization (as modified, amended or supplemented from time to time, the "***Plan***"), pursuant to which the Term Loan Lenders have agreed to sponsor a reorganization, through a debt for equity conversion, subject to higher or otherwise better offers.

On [_____], 2016, the Bankruptcy Court entered an order (the "***Bidding Procedures Order***") authorizing the Debtors to, among other things, solicit offers for the Assets or New Parent Interests through the process and procedures set forth below (the "***Bidding Procedures***").

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Pacific Sunwear of California, Inc. (9463-CA); Miraloma Borrower Corporation (0381-Del.); and Pacific Sunwear Stores Corp. (5792-CA).  The Debtors' address is 3450 East Miraloma Avenue, Anaheim, CA 92806.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Motion or the Plan.

**Marketing Process**

*Contact Parties*

The Debtors, in consultation with Guggenheim Securities, LLC ("***Guggenheim***"), the Debtors' investment banker, have developed a list of parties whom they believe may be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, a Sale, which list includes both strategic investors and financial investors (each, individually, a "***Contact Party***", and collectively, the "***Contact Parties***").  The Debtors and Guggenheim will contact the Contact Parties to explore their interest in pursuing a Sale.  The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest at such time in pursuing a transaction.  The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

The Debtors may distribute to each Contact Party and any other interested party or potential bidder an "***Information Package***" consisting of:  (i) a copy of the Bidding Procedures and the motion; (ii) a form confidentiality agreement; and (iii) such other materials as the Debtors and Guggenheim deem appropriate under the circumstances, including but not limited to preliminary "teaser" information appropriate to enable each Contact Party or other potential bidder to evaluate the proposed Sale.

*Access to Diligence Materials*

To participate in the bidding process and receive access to due diligence information (the "***Diligence Materials***"), a party must submit to the Debtors (i) an executed confidentiality agreement in the form and substance reasonably satisfactory to the Debtors, and (ii) evidence demonstrating a reasonable likelihood to close on a Sale in a timely manner, including the ability to pay the purchase price for the Assets or the New Parent Interests (the "***Purchase Price***") and to receive any and all necessary governmental, licensing, regulatory, or other approvals.

A party who qualifies for access to the Diligence Materials shall be deemed a "***Bidder***." All due diligence requests must be directed to Guggenheim.

For any Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors, with the consent of the Term Loan Lenders and their respective advisors and in consultation with the DIP Agent and their respective advisors, reserve the right to withhold, or to delay providing, any Diligence Materials that the Debtors, in their reasonable discretion and with the consent of the Term Loan Lenders, determine are business-sensitive or otherwise inappropriate for disclosure to such Bidder at such time.

*Due Diligence from Bidders*

Each Bidder and Qualified Bidder (as defined herein) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction.

## Auction Qualification Process

*Qualified Bids*

      To be eligible to participate in the Auction (as defined herein), a Bidder must deliver, so as to be received by the Recipient Parties (as defined herein) on or before **June 15, 2016 at 5:00 p.m., prevailing Eastern Time** (the "***Bid Deadline***"), a proposal, solicitation, or offer to effectuate a Sale (each, a "<u>Bid</u>") that meets the following requirements (collectively, the "***Bid Conditions***") (as reasonably determined by the Debtors, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors, it being acknowledged and agreed that subsections c.(i).-(iii) below shall not be amended or modified without the consent of the DIP Agent, the ABL Agent, and the Term Loan Lenders.).    Each such Bid shall constitute a "***Qualified Bid***," and such Bidder submitting such Bid shall be a "<u>Qualified Bidder</u>":

    a.    <u>Purpose</u>.  Each Bidder must state that the Bid includes an offer by the Bidder to purchase the Assets or the New Parent Interests.

    b.    <u>Deposit</u>.  Each Bid must be accompanied by a deposit in the amount equal to 10% of the Bidder's proposed purchase price in cash to an escrow account to be identified and established by the Debtors (the "***Deposit***").[3]

    c.    <u>Minimum Bid</u>.  Each Bid must provide for aggregate consideration (which may include non-cash consideration) that equals or exceeds the sum of:

        (i)    sufficient cash to indefeasibly pay all allowed DIP Facility Claims in full in cash at closing of the Sale, including any accrued but unpaid interest and fees due and owing under the terms of the DIP Facility, any interim or final orders governing the DIP Facility and/or any related documents; ***plus***

        (ii)    sufficient cash to indefeasibly pay all allowed ABL Claims in full in cash at closing of the Sale, including any accrued but unpaid interest and fees due and owing under the terms of the ABL Facility, any interim or final orders governing the ABL Facility and/or any related documents; ***plus***

        (iii)    sufficient cash to indefeasibly pay all allowed Term Loan Claims in full in cash at closing of the Sale, including any accrued but unpaid interest (including, without limitation, the Prepayment Premium (as defined in the Term Loan Credit Agreement) and fees due and owing under the terms of the Term Loan Credit Agreement and/or any related documents; ***plus***

        (iv)    an amount of cash sufficient to fund an amount determined by the Debtors, the DIP Agent and the Term Loan Lenders to pay all administrative and priority claims through the Effective Date of the Plan (the "***Administration Fund***");

---

[3]    For the avoidance of doubt, in no event shall a Term Loan Lender be required to provide a Deposit.

(v)     an amount of cash sufficient to fund the General Unsecured Claims Recovery Pool; ___*plus*___

(vi)    $500,000 (the "<u>Initial Minimum Overbid Increment</u>").

d.      <u>Plan or Executed Agreement</u>.  In addition to the Plan, the Debtors will provide Bidders, on request, with a form purchase agreement (the "***Purchase Agreement***"), which shall be acceptable to the Term Loan Lenders and shall comply in all material respects with the Restructuring Support Agreement and shall provide for cash consideration sufficient to pay the DIP Facility Claims, ABL Claims and Term Loan Claims in full in cash on the effective date of the Plan or the closing date of the Sale.  Any modifications to the Plan or Purchase Agreement must be agreed to by the Debtors and to the Term Loan Lenders, and subject to the approval of the Bankruptcy Court, provided that such changes shall not provide for cash consideration insufficient to pay the DIP Facility Claims, ABL Claims and Term Loan Claims in full in cash on the Effective Date of the Plan or the closing date of the Sale.

Each Bid (other than the Stalking Horse Bid, as defined herein) must include:  (a) if the Bid is to acquire the Assets, an executed Purchase Agreement, together with the exhibits and schedules related thereto and any related transaction documents or other material documents integral to such Bid, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate the Sale, including a mark-up of any changes proposed to the Purchase Agreement; or (b) if the Bid is to acquire the New Parent Interests, a mark-up of the Plan, showing any changes from the filed Plan, together with any related transaction documents or other material documents integral to such Bid, pursuant to which the Bidder proposes to effectuate the Bid (such documents in clauses (a) and (b), the "***Sale Process Documents***").

e.      <u>Minimum Liquidity</u>.  Each Bid must include evidence of committed financing, access to funds or such other financial and other information, documented to the Debtors' satisfaction, such that the Debtors, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors, will be able to determine, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors, that the Bidder has received sufficient funding commitments to effectuate the Sale (and such funding commitments or other financing shall not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors).

f.      <u>Identity</u>.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Sale), and the complete terms of any such participation.

g.    <u>Contingencies; No Financing or Diligence Outs</u>.  No Bid may be conditioned on (1) the obtaining or the sufficiency of financing or any internal approval, (2) the outcome or review of due diligence, or (3) any tax contingency.

h.    <u>Adequate Assurance of Future Performance</u>.  Each Bid must demonstrate, in the Debtors' reasonable business judgment, that the potential Bidder can provide adequate assurance of future performance under all executory contracts and unexpired leases to be assumed pursuant to a proposed Sale.

i.    <u>Offer Irrevocable</u>.  Each Bid must state that the offer by the Bidder set forth in the Sale Process Documents is irrevocable until (i) the confirmation of the Plan or closing of the proposed sale, as applicable, if such Bidder is the Winning Bidder, or (ii) the Debtors accept a higher Qualified Bid (as defined herein) and the Bidder is not selected as the Backup Bidder (as defined herein).

j.    <u>No Bid Protections</u>.  No Bid may request or entitle the Bidder to any expense reimbursement, break-up or "topping" fee, termination fee, contribution, or similar type of payment.

k.    <u>Authorization</u>.  Bids must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and the submission, execution and delivery of the Sale Process Documents, which evidence is satisfactory to the Debtors, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors.

l.    <u>Government Approvals</u>.  Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals.

m.    <u>Government Approvals Timeframe</u>.  Each Bid must set forth an estimated timeframe for obtaining any required internal, governmental, licensing, regulatory or other approvals or consents for consummating the proposed Sale.

n.    <u>Acknowledgment</u>.  Each Bid must include a written acknowledgement that the Bidder agrees to all of the terms for sale set forth in these Bidding Procedures.

o.    <u>Bid Deadline</u>.  Each Bid must be transmitted via email (in .pdf or similar format) to (collectively, the "***Recipient Parties***"): (i) Pacific Sunwear of California, Inc., 3450 E Miraloma Avenue, Anaheim, California 92806, Attn: Craig E. Gosselin, Esq.  (cgosselin@pacificsunwear.com;  (ii) Guggenheim  Securities,  LLC,  the Debtors'  proposed  investment  bankers,  3414  Peachtree  Road  NE,  Suite  960, Atlanta,    GA    30326,    Attn.:    Jay    C.    Jacquin

(jay.jacquin@guggenheimpartners.com); and (iii) Klee, Tuchin, Bogdanoff & Stern, LLP, the Debtors' proposed counsel, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067, Attn: Michael L. Tuchin, Esq. (mtuchin@ktbslaw.com), so as to be **actually received** on or before the Bid Deadline. The Debtors shall promptly provide copies of transmitted bids received to (i) Kirkland & Ellis LLP, the Term Loan Lenders' counsel, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (jsussberg@kirkland.com) and 555 California Street, San Francisco, California 94104, Attn: Melissa Koss (melissa.koss@kirkland.com); and (ii) Perella Weinberg Partners, 767 Fifth Avenue New York, New York 10153, Attn: Bruce Mendelson (bmendelsohn@pwpartners.com) and Jakub Mleczko (jmleczko@pwpartners.com); and (iii) Choate Hall & Stewart LLP, the DIP Agent's and ABL Agent's counsel, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com) and Sean M. Monahan (smonahan@choate.com).

The Debtors, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors, reserve the right to work with any Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors, may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Debtors' assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the Auction); provided, that, for the avoidance of doubt in no event may any no Bid or combination of Bids be accepted or deemed a Qualified Bid in any circumstance unless such Bid or multiple bids provide(s) for cash consideration sufficient to pay the DIP Facility Claims, ABL Claims and Term Loan Claims in full in cash on the Effective Date of the Plan or the closing date of the Sale.

### Stalking Horse Bid

The Term Loan Lenders will serve as the stalking horse purchasers for substantially all of the Debtors' assets on the terms and as provided for in the Plan (the "***Stalking Horse Bid***") (it being acknowledged that such Stalking Horse Bid shall provide for payment in full in cash of all DIP Facility Claims and ABL Claims on the Effective Date of the Plan or the closing date of the Sale), which bid shall be deemed a Qualified Bid and the Term Loan Lenders deemed a Qualified Bidder. The Term Loan Lenders' Stalking Horse Bid shall be deemed the minimum Qualified Bid at the Auction. The Term Loan Lenders' expressly reserve all rights associated with the Term Loan Claims, including any right to credit bid pursuant to section 363(k) of the Bankruptcy Code.

### Baseline Bid

After the Bid Deadline, the Debtors shall, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors, determine which Qualified Bid represents the then highest or otherwise best bid (the "***Baseline Bid***").

The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Winning Bid (as defined herein) shall take into account any factors the Debtors, in consultation with the Term Loan Lenders, the DIP Agent and their respective advisors, reasonably deem relevant to the value of the Qualified Bid to their estates, including, *inter alia*:  (a) the amount and nature of the consideration; (b) certainty of closing; (c) the net economic effect of any changes to the value to be received by each of the Debtors' classes of claims or interests from the transaction currently set forth in the Plan, if any, contemplated by the Sale Process Documents; and (d) tax consequences of such Qualified Bid (collectively, the "***Bid Assessment Criteria***").  A Qualified Bid selected as the Baseline Bid shall be provided to all other Qualified Bidders at least twenty-four hours prior to the start of an Auction.

## The Auction

If one or more Qualified Bids (in addition to the Stalking Horse Bid) are received by the Bid Deadline, the Debtors will conduct an auction (the "***Auction***") to determine the Winning Bidder.  The Auction shall take place on **June 22, 2016 at 10:00 a.m., prevailing Eastern Time**, at the offices of Klee, Tuchin, Bogdanoff & Stern, LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067, or such later date and time as selected by the Debtors, in consultation with the DIP Agent and the Term Loan Lenders.  The Debtors shall send written notice of the date, time, and place of the Auction to the Qualified Bidders no later than two business days before such Auction, and will post notice of the date, time, and place of the Auction no later than two business days before such Auction on the website of the Debtors' notice and claims agent, Prime Clerk LLC, at https://cases.primeclerk.com/pacsun.  The Auction shall be conducted by the Debtors in a timely fashion according to the following procedures.

If no Qualified Bids are submitted by the Bid Deadline, the Debtors shall not hold an Auction, and the Term Loan Lenders shall be the Winning Bidder.  Notwithstanding anything herein to the contrary, the Debtors shall not be required to determine that any Bid is the Baseline Bid and may determine not to hold an Auction if the Debtors, in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors, determine the Bids to be inadequate.

In the event that any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors shall cause such Bidder to be refunded its Deposit and accumulated interest thereon, if any, within three business days after the Bid Deadline.

### *Auction Procedures*

The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid.

The Debtors and their advisors and representatives, any official committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code (the "***Committee***"), its

advisors, and all Qualified Bidders will be permitted to attend the Auction, though only the Qualified Bidders and the Debtors and their advisors and representatives shall be entitled to: (i) make any subsequent bids at the Auction; (ii) make statements on the record at the Auction; or (iii) otherwise participate at the Auction in any manner whatsoever.  The Qualified Bidders shall appear in person at the Auction, through a duly authorized representative.

In the event that a Qualified Bid is comprised of more than one entity (each a "***Member***," and collectively, the "***Members***"), if less than all of the Members of any Qualified Bidder elect to participate in any round of the Auction, such remaining participating Member or Members shall be required to demonstrate such remaining Member's or Members' financial capacity to consummate the transactions required by such Member's or Members' Bid.

In addition, all creditors of the Debtors shall be permitted to attend the Auction, *provided*, that for a creditor (other than a creditor who is a Qualified Bidder or Committee member) to be permitted to attend the Auction, such creditor must advise of its intent to attend via electronic mail to Shanda Pearson (spearson@ktbslaw.com) on or before the Bid Deadline.

***Overbids***

All Qualified Bidders shall have the right to submit an Overbid.  An "***Overbid***" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid.  To submit an Overbid for purposes of the Auction, a Qualified Bidder must comply with the following conditions:

p.   <u>Minimum Overbid Increment</u>.  Any Overbid after the Baseline Bid shall be made in increments of at least $500,000 (the "***Overbid Increments***").

q.   <u>Overbid Modifications</u>.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid, but shall otherwise comply with the terms of these Bidding Procedures.  Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; *provided, however*, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply.  Any Overbid shall remain open and binding on the Bidder until and unless (i) the Debtors accept a higher Qualified Bid as an Overbid, and (ii) such Overbid is not selected as the Backup Bid.  Any modifications to the Sale Process Documents on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than such Qualified Bidder's previous bid.

r.   <u>Closing Evidence</u>.  To the extent not previously provided, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors (in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors) demonstrating such Qualified Bidder's ability to close the Sale proposed by such Overbid, including providing adequate assurance of future performance.

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria.

During the course of the Auction, the Debtors shall, after the submission of each Overbid, promptly inform each participant which Overbid reflects, in the Debtors' view (after consultation with the DIP Agent, the Term Loan Lenders and their respective advisors), the highest or otherwise best offer. The Auction may include individual negotiations between the Debtors and Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders.

The Debtors reserve the right, in their reasonable business judgment (after consultation with the DIP Agent, the Term Loan Lenders and their respective advisors), to adjourn the Auction one or more times to, among other things: facilitate discussions between the Debtors and Qualified Bidders, allow Qualified Bidders to consider how they wish to proceed, and provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment (after consultation with the DIP Agent, the Term Loan Lenders and their respective advisors) may require, to demonstrate that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent funding commitments, to consummate the proposed transaction at the prevailing Overbid amount and provide adequate assurance of future performance.

*Other Auction Procedures*

The rights of each of (i) the Term Loan Agent on behalf of the Term Loan Lenders, (ii) the ABL Agent on behalf of the ABL Lender and (iii) the DIP Agent on behalf of the DIP Lenders to "credit bid" pursuant to section 363(k) of the Bankruptcy Code, either in whole or in part, are preserved and may be exercised in accordance with applicable law.

The Debtors reserve the right to remove any Qualified Bidder (other than the Term Loan Agent on behalf of the Term Loan Lenders) from the Auction if, at any point, the Debtors determine in their business judgment (after consultation with the DIP Agent, the Term Loan Lenders and their respective advisors) that the Qualified Bidder is no longer engaged in active bidding at the Auction (including, without limitation, if such Qualified Bidder has failed to bid in previous rounds of bidding).

The Debtors may announce at the Auction (after consultation with the DIP Agent, the Term Loan Lenders and their respective advisors) additional procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction provided such additional rules are not inconsistent with these Bidding Procedures.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures.

Each Qualified Bidder participating at the Auction will be required to confirm that (i) it has not engaged in any collusion with respect to the bidding (though Qualified Bidders are permitted to make joint bids), and (ii) its Qualified Bid is a good faith, bona fide offer and it intends to consummate the proposed transaction if selected as the Winning Bidder.

*The Winning Bid / Procedures for Closing the Auction*

The Auction shall continue until there is only one Qualified Bid that the Debtors (in

consultation with the Term Loan Lenders (provided that none of the Term Loan Lenders is an active participant in the Auction, other than by virtue of being deemed a Qualified Bidder with a deemed Qualified Bid pursuant to these Bidding Procedures), the DIP Agent, and their respective advisors), determine in their reasonable business judgment is the highest or otherwise best Qualified Bid (such Qualified Bid, the "***Winning Bid***", and such Qualified Bidder, the "***Winning Bidder***"), and that further bidding is unlikely to result in a higher or otherwise better bid that would be acceptable to the Debtors, at which point, the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit a higher or otherwise better bid at the Auction to the then-existing Overbid.

Such acceptance by the Debtors of the Winning Bid is conditioned upon approval by the Bankruptcy Court of the Winning Bid and the entry of the order confirming the Plan or otherwise approving the Sale.

The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction and any and all such Bids and Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

In selecting the Winning Bid, the Debtors, in consultation with the Term Loan Lenders (provided that none of the Term Loan Lenders is an active participant in the Auction, other than by virtue of being deemed a Qualified Bidder with a deemed Qualified Bid pursuant to these Bidding Procedures), the DIP Agent and their respective advisors, may consider all factors, including, without limitation, the Bid Assessment Criteria.

The Debtors, in consultation with the Term Loan Lenders, the DIP Agent, and their respective advisors, may require that within two days after adjournment of the Auction, the Winning Bidder complete and execute all Sale Process Documents, instruments, or other documents evidencing and containing the terms and conditions upon which the Winning Bid was made.

The Deposits of each Qualified Bidder shall be held in one or more escrow accounts by the Debtors and shall be returned (other than with respect to the Winning Bidder and the Backup Bidder) within three business days after the Auction.  Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon, if any.  If the Winning Bidder (or the Backup Bidder, if applicable) timely closes the Sale, its Deposit shall be credited towards its purchase price.

***The Backup Bidder***

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the party with the next-highest or otherwise second best Qualified Bid at the Auction (as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Term Loan Lenders (provided that none of the Term Loan Lenders is an active participant in the Auction, other than by virtue of being a deemed Qualified Bidder with a deemed Qualified Bid pursuant to these Bidding Procedures), the DIP Agent, and their respective advisors) shall be required to serve as a backup bidder (the "***Backup Bidder***").  The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder

(the "***Backup Bid***") shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Winning Bid and the Winning Bidder. The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (i) 5:00 p.m., prevailing Eastern time, on the first business day that is sixty days after the date on which the Auction is concluded, or (ii) the closing of the transaction with the Winning Bidder (the "***Outside Backup Date***").

Following the hearing to confirm the Plan (the "***Confirmation Hearing***") or to approve the Sale (the "***Sale Hearing***"), if the Winning Bidder fails to consummate an approved Sale, the Debtors may select the Backup Bidder as the Winning Bidder. The Debtors will be authorized, but not required, to consummate the Sale to such Backup Bidder without further order of the Bankruptcy Court or notice to any party. In such case, the defaulting Winning Bidder's deposit shall be forfeited to the Debtors (and applied to the DIP Facility Claims), and the Debtors specifically reserve the right to seek all available damages from the defaulting Winning Bidder. The deposit of the Backup Bidder shall be held by the Debtors until 24 hours after the earlier of (a) the closing of the transaction with the Winning Bidder, and (b) the Outside Backup Date.

If no other Bids remain that would otherwise qualify as a Backup Bid, and the Winning Bid Sale is not consummated, the Stalking Horse Bid shall be implemented through the Plan.

## Post-Auction Procedures

Upon selection of a Winning Bid (which will be subject to approval by the Bankruptcy Court), if any, the Debtors will file the Winning Bid with the Bankruptcy Court and shall proceed to the Confirmation Hearing, which Confirmation Hearing shall also constitute a hearing on the Sale, or the Sale Hearing (as applicable). Any such Confirmation Hearing or Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Confirmation Hearing or Sale Hearing.

## Failure to Consummate Purchase by the Winning Bidder

The Deposit of the Winning Bidder shall be applied to the Purchase Price at the closing of the Sale. If the Winning Bidder fails to timely consummate a Sale consistent with the Winning Bid because of a breach or failure to perform on the part of such Winning Bidder, the Backup Bidder will be deemed to be the new "Winning Bidder" and the Debtors will be authorized, but not required, to consummate a Sale with the Backup Bidder as contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party; *provided*, *however*, that if such bid is a different structure than the Winning Bid, then the Debtors will be required to consult with the Term Loan Lenders and the DIP Agent and obtain appropriate approval orders from the Bankruptcy Court. In such case, (a) the defaulting Winning Bidder's Deposit shall be forfeited to the Debtors (and applied to the DIP Facility Claims) and (b) all parties in interest, and the Debtors specifically, reserve the right to seek all available damages from the defaulting Winning Bidder.

The Deposit of the Backup Bidder shall be held by the Debtors and shall be (a) applied to

the Purchase Price at the closing of the Sale if the Debtors consummate the Sale with the Backup Bidder, (b) forfeited to the Debtors (and applied to the DIP Facility Claims) if the Backup Bidder becomes the Winning Bidder and the Backup Bidder fails to reasonably promptly consummate a Sale consistent with the Backup Bid because of a breach or failure to perform on the part of the Backup Bidder as set forth in the Sale Documents, or (c) returned to the Backup Bidder within three (3) business days after the Outside Backup Date if the Backup Bidder does not become the Winning Bidder.

<u>**No Modification of Procedures**</u>

These Bidding Procedures may not be modified in any material manner except upon (i) an order of the Bankruptcy Court or (ii) the express written consent of the Debtors (with the consent of the DIP Agent and the Term Loan Lenders).

<u>**Reservation of Rights**</u>

Solely in connection with the exercise of the Debtors' fiduciary obligations, the Debtors (in consultation with the DIP Agent, the Term Loan Lenders and their respective advisors) reserve their rights to modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets or New Parent Interests, including, without limitation, extending the deadlines set forth in the Bidding Procedures, modifying bidding increments, adjourning or canceling the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, withdrawing from the Auction any or all of the Assets or New Parent Interests at any time prior to or during the Auction, or canceling the Sale process or Auction, and rejecting all Qualified Bids if, in the Debtors' business judgment no such bid is for a fair and adequate price; *provided, however*, that in no event may any Bid or combination of Bids be accepted or deemed a Qualified Bid in any circumstance unless such Bid or multiple Bids provide(s) for cash consideration sufficient to pay the DIP Facility Claims, ABL Claims and Term Loan Claims in full in cash on the Effective Date of the Plan or the closing date of the Sale.

<u>**No Impairment Under the Restructuring Support Agreement**</u>

Nothing in these Bidding Procedures shall (or otherwise be deemed to) amend, modify, supplement, supersede, impair, replace, or otherwise alter any of the rights and obligations of the Debtors or any of the counterparties under the Restructuring Support Agreement.

**<u>Exhibit C</u>**

**Joinder**

# JOINDER AGREEMENT

The undersigned ("***Joining Party***") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [_____], 2016 (as it may be amended, supplemented, or otherwise modified from time to time, the "***Restructuring Support Agreement***"),[1] by and among (i) Pacific Sunwear of California, Inc., Pacific Sunwear Stores Corp., and Miraloma Borrower Corporation (collectively, the "***Debtors***"), (ii) PS Holdings of Delaware, LLC - Series A and PS Holdings of Delaware, LLC - Series B, in their capacities as lenders under that certain Credit Agreement dated as of December 7, 2011 (together with their respective successors and permitted assigns, the "***Consenting Term Loan Lenders***") and (iii) PS Holdings Agency Corp. in its capacity as administrative agent and collateral agent under that certain Credit Agreement dated as of December 7, 2011.

1.    <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Restructuring Support Agreement.  The Joining Party shall hereafter be deemed to be a "Consenting Term Loan Lender" and a "Party" for all purposes under the Restructuring Support Agreement.

2.    <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Term Loan Claims set forth below its name on the signature page hereof, the Joining Party hereby makes the representations and warranties of the Consenting Term Loan Lenders set forth in Section 5 of the Restructuring Support Agreement to each other Party.

3.    <u>Governing Law</u>.  This joinder agreement (the "***Joinder Agreement***") to the Restructuring Support Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

\* \* \* \* \*

*[Remainder of Page Intentionally Left Blank]*

---

[1]      Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Restructuring Support Agreement.

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

Name of Joining Party: _____

By: _____

Name: _____

Title: _____

Principal Amount of Term Loan Claims Held:  $_____

Notice Address:

_____

_____

_____
Fax: _____
Attention: _____

With a copy to:

_____

_____

_____
Fax: _____
Attention: _____

_____