**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>PACIFIC SUNWEAR OF CALIFORNIA, INC., a California corporation, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 16-10882 (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF JAMES D. DECKER IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) GRANTING <u>RELATED RELIEF, AND (VII) SCHEDULING A FINAL HEARING</u>**

I, James D. Decker, declare as follows:

1. I am a Senior Managing Director with Guggenheim Securities, LLC ("<u>Guggenheim</u>"), the Debtors' investment banker. I am an individual over the age of 18.

2. Except as otherwise stated, I have personal knowledge of the facts set forth herein, and if called upon to testify, would testify competently to all of the facts set forth herein.

3. This Declaration is being submitted in connection with the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Granting Adequate*

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Pacific Sunwear of California, Inc. (9463-CA); Miraloma Borrower Corporation (0381-Del.); and Pacific Sunwear Stores Corp. (5792-CA). The Debtors' address is 3450 East Miraloma Avenue, Anaheim, CA 92806.

*Protection, (v) Modifying Automatic Stay, (vi) Granting Related Relief, and (vii) Scheduling a Final Hearing* (the "DIP Motion").

   4. In forming the opinions set forth herein, I have relied upon and/or considered, among other things, the following: (i) my experiences in chapter 11 cases, including with debtor-in-possession ("DIP") financing facilities; (ii) the DIP Motion; (iii) the Debtors' financial statements, reports, and financial projections; (iv) documents related to the proposed DIP financing; (v) Guggenheim's analyses regarding the proposed DIP financing and DIP financings in other chapter 11 cases; (vi) discussions with the Debtors' management concerning the Debtors' business and finances; (vii) discussions with alternative prospective sources of DIP financing; and (viii) discussions with my colleagues and other advisors to the Debtors.

   5. As a Senior Managing Director at Guggenheim, I have significant experience in a wide variety of corporate finance transactions, including restructurings, acquisitions, debt and equity financings, leveraged buyouts, fairness opinions, business valuations and intangible asset valuations. I focus on middle market merger and acquisition, financing, and restructuring advisory services. In the course of my career, I have completed in excess of 150 assignments across a variety of industries and situations for companies and creditors. I have worked with clients across a diverse range of industries, including in the retail sector. Prior to joining Guggenheim in 2013, I was a Managing Director with Morgan Joseph TriArtisan LLC and Head of the firm's Recapitalization & Restructuring Group. Prior to joining Morgan Joseph, I was a Managing Director with Alvarez & Marsal, and served as co-head of the firm's Corporate Finance Group headquartered in New York. Before joining Alvarez & Marsal, I was a Managing Director with Houlihan Lokey Howard & Zukin, where I served as co-head of the firm's Atlanta office and was responsible for new client development, engagement management,

and personnel development for its Restructuring and Corporate Finance practices.  Previously, I founded and served as president of Inverness Partners Incorporated, a boutique mergers and acquisitions firm that was acquired by Houlihan Lokey Howard & Zukin in July of 1999.  Before Inverness Partners, I was head of the Mergers and Acquisitions department of SunTrust Capital Markets, Inc.  I began my career as an investment banker in the Corporate Finance department of Bear, Stearns & Co., Inc.

6. I received my Bachelor of Arts degree in Economics and Geology from Vanderbilt University and my Masters in Business Administration with a concentration in Finance from The Wharton School of the University of Pennsylvania.  I am a licensed FINRA General Securities Registered Representative (Series 7, 24, 64) and a Certified Insolvency and Restructuring Advisor (CIRA).  Additionally, I am a 1983 Smithsonian Institution Fellow and a frequent speaker on the topics of corporate finance, mergers and acquisitions, capital markets and financial restructuring.

7. I understand that in 2011 the Debtors incurred significant secured debt in the form of a $100 million asset-based lending revolving credit facility (the "<u>ABL Facility</u>") provided by Wells Fargo Bank, N.A. (the "<u>ABL Lender</u>") and a $60 million term loan (the "<u>Term Loan</u>") provided by affiliates of Golden Gate Capital, PS Holdings of Delaware, LLC – Series A and PS Holdings of Delaware, LLC – Series B (together, the "<u>Term Loan Lenders</u>").

8. The Debtors have been an investment banking client of Guggenheim for several years and, in late 2015, Guggenheim was assisting the Debtors in exploring potential merger and/or acquisition opportunities.  Ultimately, those opportunities did not materialize and, at the time that my team began advising the Debtors in early 2016, the Debtors were experiencing increasing liquidity constraints as a result of high occupancy costs , significant debt service

burden, and contracting trade terms.  In addition, the Debtors anticipated that the April 2016 audit would likely contain a going concern qualification, which would qualify as an Event of Default under both the ABL Facility and the Term Loan.  In recognition of these challenges as well as the impending ABL Facility and the Term Loan maturities on December 7, 2016, Guggenheim's engagement evolved to include a more fulsome exploration of all of the Debtors' potential strategic alternatives and greater involvement of Guggenheim's restructuring team.  At my direction, Guggenheim undertook a fulsome evaluation of various potential strategic alternatives, including the restructuring, refinancing or extension of the maturity dates of the ABL Facility and Term Loan.

9. At the conclusion of the strategic alternatives evaluation, it was determined that the projected operating performance of the business and the challenging retail landscape suggested that a refinancing or sale of the Debtors at a level that would exceed the Debtors' debt levels was highly unlikely.  The Debtors briefly engaged in discussions with the Term Loan Lenders to evaluate the possibility of an out-of-court restructuring, but it was quickly apparent that an out-of-court transaction was not viable.  Ultimately, given the tightening liquidity, the impending default, and the apparent absence of other viable alternatives, the Debtors determined to focus their efforts on negotiating a prearranged chapter 11 transaction and obtaining DIP financing.

10. Alongside the Debtors' management, Guggenheim engaged with the ABL Lender and the Term Loan Lenders as well as five other highly-regarded asset-based lenders to determine interest in providing DIP financing to the Debtors.  Of the parties contacted, three entered into non-disclosure agreements and were subsequently granted access to a data room that Guggenheim helped prepare containing the information necessary for them to make a decision

on whether they would be willing to provide DIP financing to the Debtors on what terms. I and my team participated directly in discussions and negotiations with these potential lenders.

11. In the discussions with the potential lenders, I and my team inquired whether they would be interested in providing financing to the Debtors on a *pari passu* basis with the ABL Lender and the Term Loan Lenders, on a junior secured basis, or on an unsecured, administrative expense basis. We also inquired whether they would be willing to refinance not only the ABL Facility, but also the Term Loan. None of the potential lenders were interested in lending money on these terms. Although certain of the potential lenders expressed interest in providing DIP financing to the Debtors on a senior-secured, first-priority basis, those lenders were not interested in pursuing a non-consensual priming of the liens securing the ABL Facility and Term Loan, as that would likely result in expensive and uncertain litigation with the ABL Lender and Term Loan Lenders and have a resulting detrimental impact on the Debtors' business.

12. Wells Fargo Bank, N.A. ("Wells Fargo"), however, was willing to provide DIP financing to the Debtors in the form of a $100 million senior secured debtor in possession revolving credit facility (the "DIP Facility") which contemplates the roll-up of the Debtors' prepetition obligations under the ABL Facility. Critically, the DIP Facility has the consent and support of the Term Loan Lenders, who have agreed, under certain terms and conditions, to subordinate their existing liens to the liens securing the DIP Facility in certain of the Debtors' assets (notably, accounts receivable and inventory) pursuant to the terms of the intercreditor agreement entered into with respect to the ABL Facility and the Term Loan.

13. Like any retailer, access to financing is critical. Here, the DIP Facility not only sends a fundamentally positive signal to the Debtors' vendors, employees, and other parties critical to maintaining the Debtors' viability as a going concern, but it also provides the Debtors

with the time and flexibility that they need to proceed with a chapter 11 plan of reorganization, subject to higher or otherwise better bids, under which the Term Loan Lenders will convert a substantial portion of the Term Loan into equity in the reorganized Debtors and the Debtors' general unsecured creditors will receive a cash recovery on account of their claims.

14. Based on my experience, I believe that the DIP Facility is on the best terms and conditions that the Debtors were able to arrange under the circumstances. Based on my experience and discussions with the other potential lenders, I do not believe that the Debtors could have obtained any viable DIP financing under the circumstances of the type and magnitude required in the Debtors' chapter 11 cases on any other basis than the terms of the DIP Facility. The DIP Facility provides for increased inventory advance rates and a reduced excess availability requirement, resulting in several million dollars of increased availability relative to ABL Facility. In my view, the DIP Facility is on market terms and conditions for chapter 11 debtors with comparable financial conditions and projections to those of the Debtors.

15. As reflected in the Budget (as defined in the Motion), the Debtors have an immediate need to access a portion of the DIP Facility, and, upon entry of the final order approving the DIP Facility, the Debtors will need access to the balance of the DIP financing for the remainder of these chapter 11 cases. Based on the Debtors' projected liquidity needs, I believe that the proposed DIP Facility will provide the Debtors with sufficient funds during these chapter 11 cases to meet their obligations to employees, customers and contract and lease counterparties and to satisfy their working capital and operational needs, all of which will preserve the value of the Debtors' estates.

16. In my view, the DIP Financing is a vital component in preserving the value of the Debtors' business and, as such, is in the best interests of the Debtors' estates and creditors.

17. I have personally participated in negotiations with Wells Fargo and believe that the Debtors' negotiations with Wells Fargo were conducted at arm's length and in good faith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 6th day of April, 2016 at Atlanta, Georgia.

        Guggenheim Securities, LLC

        _____
        By: James D. Decker
        Its: Senior Managing Director